No. 25-8156

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

CARLITOS RICARDO PARIAS,
*Defendant-Appellee.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 25-904-FMO*

## GOVERNMENT'S OPENING BRIEF

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

ALEXANDER P. ROBBINS
Assistant United States Attorney
Acting Chief, Criminal Appeals
Section

AMY E. POMERANTZ
Assistant United States Attorney
Criminal Appeals Section

1200 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Email: amy.pomerantz@usdoj.gov

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

**DESCRIPTION**                                                                    **PAGE**

I.     INTRODUCTION .......................................................................................... 1

II.    ISSUE PRESENTED ..................................................................................... 4

III.   STATEMENT OF THE CASE ....................................................................... 5

       A.   Jurisdiction, Timeliness, and Bail Status ............................... 5

       B.   Statement of Facts and Procedural History ........................... 5

            1.   October 2025: Defendant Rams Government
                 Vehicles With His Car While Attempting to
                 Evade Immigration Enforcement ................................... 5

            2.   Mid-November 2025: The Case Is Assigned to
                 District Judge Olguin, Who Immediately Orders
                 Defendant Released on Bail and Preemptively
                 Threatens to Dismiss the Case ..................................... 8

            3.   Late November / Early December 2025:
                 Defendant is Transferred to Immigration Custody
                 85 Miles Outside of Downtown Los Angeles, and
                 Defense Counsel Unsuccessfully Attempts to Set
                 Up a Videoconference With His Client ........................ 10

            4.   First Hearing, Early December 2025: The District
                 Court Fixates on the Bail Issue and Objects to
                 Defendant's Civil Immigration Detention ................... 12

            5.   Second Hearing, Early December 2025: The
                 District Court Suggests That Defense Counsel
                 Move to Dismiss the Indictment After Counsel
                 Mentions Difficulties Scheduling a
                 Videoconference With His Client ................................. 14

**TABLE OF CONTENTS (continued)**

**DESCRIPTION**                                                        **PAGE**

6.    December 27, 2025: The District Court Grants the Dismissal Motion It Proposed—With Prejudice .................................................... 18

IV.    SUMMARY OF ARGUMENT ....................................... 25

V.    ARGUMENT ................................................................ 28

    A.    Standard of Review ............................................... 29

    B.    Civil Detention by Immigration Authorities Following Release on Bail in Criminal Proceedings Is Not Unlawful, Let Alone Government Misconduct ..................... 29

        1.    The Bail Reform Act and Immigration and Nationality Act Run on Parallel, Independent Tracks ......................................................... 31

        2.    Section 3142(d) is a Notice Provision; It Does Not Constrain Immigration Officials' Independent Detention Authority ..................................... 39

        3.    The District Court Misapplied Caselaw ...................... 45

            a.    *Santos-Flores* supports the government's— not the district court's—position in this case ..... 45

            b.    *Trujillo-Alvarez* was wrongly decided ................ 48

        4.    The District Court's Impermissible-Purpose Finding Was Clear Error ............................................. 52

    C.    Dismissal With Prejudice Was an Abuse of Discretion ........ 59

        1.    The District Court Failed to Tailor the Remedy to the Constitutional Injury ............................................. 60

ii

## TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                         **PAGE**

    2.    Dismissal With Prejudice, Rather Than Without, Was Unjustified ........................................................... 64

    3.    The Court's True Rationale—Protesting ICE's Practices—is an Illegitimate Basis for Exercising Supervisory Power ....................................................... 66

VI.    CONCLUSION ................................................................. 69

# TABLE OF AUTHORITIES

**DESCRIPTION**                                         **PAGE(S)**

### Cases

*Betterman v. Montana,*
578 U.S. 437 (2016).................................................................35, 62

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018)......................................................................31

*Jennings v. Rodriguez,*
583 U.S. 281 (2018)................................................................49, 50

*Jones v. Hendrix,*
599 U.S. 465 (2023)......................................................................50

*Khatib v. County of Orange,*
639 F.3d 898 (9th Cir. 2011).........................................................49

*Morton v. Mancari,*
417 U.S. 535 (1974)......................................................................31

*Ochoa v. Campbell,*
266 F. Supp. 3d 1237 (E.D. Wash. 2017)......................................54

*Reno v. Koray,*
515 U.S. 50 (1995)........................................................................50

*United States v. Baltazar-Sebastian,*
990 F.3d 939 (5th Cir. 2021)................................................ passim

*United States v. Barrera-Landa,*
964 F.3d 912 (10th Cir. 2020)............................................... passim

*United States v. Barrera-Omana,*
638 F. Supp. 2d 1108 (D. Minn. 2009)..........................................22

*United States v. Bundy,*
968 F.3d 1019 (9th Cir. 2020).......................................................29

iv

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                  **PAGE(S)**

*United States v. Chapman,*
 524 F.3d 1073 (9th Cir. 2008) .................................................. passim

*United States v. Diaz-Hernandez,*
 943 F.3d 1196 (9th Cir. 2019) .................................... 25, 32, 37, 43

*United States v. Edmonds,*
 103 F.3d 822 (9th Cir. 1996) ............................................................ 52

*United States v. Isgro,*
 974 F.2d 1091 (9th Cir. 1992) ........................................ 3, 59, 63, 64

*United States v. Lett,*
 944 F.3d 467 (2d Cir. 2019) ...................................................... passim

*United States v. Lucas,*
 873 F.2d 1279 (9th Cir. 1989) .............................................. 19, 21, 27

*United States v. Mejia Hernandez,*
 2020 WL 1181495 (C.D. Cal. Feb. 20, 2020) ............................... 53, 54

*United States v. Morrison,*
 449 U.S. 361 (1981) ................................................................... passim

*United States v. Myers,*
 692 F.2d 823 (2d Cir. 1982) ............................................................ 44

*United States v. Pacheco-Poo,*
 952 F.3d 950 (8th Cir. 2020) ...................................................... 36, 48

*United States v. Rogers,*
 751 F.2d 1074 (9th Cir. 1985) ......................................................... 63

*United States v. Santos-Flores,*
 794 F.3d 1088 (9th Cir. 2015) ................................................... passim

*United States v. Simpson,*
 927 F.2d 1088 (9th Cir. 1991) ................................................... passim

v

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                                        **PAGE(S)**

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) .................................................................58

*United States v. Soriano Nunez,*
928 F.3d 240 (3d Cir. 2019) .................................... 35, 36, 48

*United States v. Trujillo-Alvarez,*
900 F. Supp. 2d 1167 (D. Or. 2012) ............................. passim

*United States v. Vasquez-Benitez,*
919 F.3d 546 (D.C. Cir. 2019) ...................................... passim

*United States v. Veloz-Alonso,*
910 F.3d 266 (6th Cir. 2018) ........................................ 36, 48

*United States v. Ventura,*
96 F.4th 496 (2d Cir. 2024) .................................... 26, 51, 52

*United States v. Wilson,*
123 F.4th 1021 (9th Cir. 2024) .........................................3

*Yith v. Nielsen,*
881 F.3d 1155 (9th Cir. 2018) ...........................................54

*Zavala v. Ives,*
785 F.3d 367 (9th Cir. 2015) ............................ 22, 54, 55, 57

## Statutes

8 U.S.C. § 1225(b) ...............................................................32, 42

8 U.S.C. § 1226 ................................................................. passim

8 U.S.C. § 1231(a) .......................................................49, 50, 54

18 U.S.C. § 111 ....................................................................8, 9

18 U.S.C. § 1361 ..................................................................9, 10

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                  **PAGE(S)**

18 U.S.C. § 3141 ................................................................32

18 U.S.C. § 3142 ......................................................... passim

18 U.S.C. § 3143 ................................................................32

18 U.S.C. § 3145 ................................................................32

18 U.S.C. § 3161 ................................................................23

18 U.S.C. § 3231 ..................................................................5

18 U.S.C. § 3731 ..................................................................5

28 U.S.C. § 1291 ..................................................................5

**Rules**

Fed. R. App. P. 4(b)(1)(B)(i) .................................................5

Fed. R. Crim. P. 48(a) ........................................................34

**Regulations**

8 C.F.R. § 215.2(a) .............................................................51

8 C.F.R. § 236.1(b) ..............................................................6

No. 25-8156

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

CARLITOS RICARDO PARIAS,
*Defendant-Appellee.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 25-904-FMO*

## GOVERNMENT'S OPENING BRIEF

## I

## INTRODUCTION

At the outset of the first district court hearing in this case, the court told the parties it was considering dismissing the indictment because defendant Carlitos Parias—an unlawfully present Mexican citizen charged with assaulting federal law-enforcement officers—had been detained under the Immigration and Nationality Act pending civil removal proceedings. *See* 8 U.S.C. § 1226(c)(1)(E)(ii) (mandatory

detention for "criminal aliens" charged with "assault of a law enforcement officer").  In the district court's view, defendant's civil immigration detention was improper because defendant had been released on bond under the Bail Reform Act in his criminal case.

Five days later, at another hearing, the Federal Public Defender (who was personally representing defendant) told the district court that he had been unable to schedule a videoconference with defendant in the past week.  (He had not tried to meet with his client in person.)  The district court responded by urging defense counsel to file a motion to dismiss the indictment.  Defense counsel did so the very next day.  The district court then granted the motion, dismissing the case with prejudice.

That was an abuse of discretion—and reversible legal error—even if a Sixth Amendment violation occurred.  Because the district court fundamentally misunderstood the relationship between the Bail Reform Act and the Immigration and Nationality Act, it incorrectly viewed defendant's civil immigration detention as an affront to its bail-release decision.  That error not only infected its legal analysis but led to the drastic—and grossly disproportionate—remedy of dismissal with

prejudice. *See United States v. Morrison*, 449 U.S. 361, 364 (1981). The court's baseline premise was wrong: the BRA and INA are separate statutory schemes that run on separate, parallel tracks. They are not in conflict. Nor do they require the government to choose between prosecution and removal. This Court should reverse and join the seven circuits that have unanimously held that civil detention of an alien defendant under the INA does not run afoul of the BRA.

The district court in this case imposed the "most severe sanction possible," *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992), not to remedy any prejudice or constitutional injury suffered by this particular defendant, but to rebuke the Executive Branch for lawfully detaining an alien in civil immigration custody pending his removal proceedings. That was an impermissible exercise of its supervisory powers. *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) ("[B]ecause dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, this sanction may be permitted only in cases of flagrant prosecutorial misconduct.") (cleaned up); *cf. United States v. Wilson*, 123 F.4th 1021, 1030 (9th Cir. 2024) (Bumatay,

J., concurring) (district court is not allowed to dismiss indictment to protest the government's exercise of its prosecutorial discretion).

This Court has admonished that "[i]n the exercise of the supervisory power, judges must be careful to supervise their own affairs and not those of the other branches." *United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991). A district court may not "by exercise of judicial fiat[] impose [its] will upon the coordinate branches." *Id.* That is what happened here: the district court strayed far outside its lane. This Court should reverse.

## II

## ISSUE PRESENTED

Whether the district court abused its discretion by dismissing all criminal charges with prejudice because—following defendant's release under the Bail Reform Act—defendant was civilly detained under the Immigration and Nationality Act pending his removal from the United States, and his criminal defense lawyer was unable to schedule a videoconference with him in the weeks leading up to his initial trial date.

# III

# STATEMENT OF THE CASE

## A.  Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This Court's jurisdiction rests on 18 U.S.C. § 3731 and 28 U.S.C. § 1291.  The district court dismissed the indictment with prejudice on Saturday, December 27, 2025.  (ER-32–33.)[1]  The government filed a timely notice of appeal three days later.  (ER-209.)  *See* Fed. R. App. P. 4(b)(1)(B)(i).  Defendant was not detained pursuant to 18 U.S.C. § 3142 pending trial on his criminal charges; as of the date of this filing, defendant is detained in civil immigration custody pending his removal proceedings.

## B.  Statement of Facts and Procedural History

### 1.  *October 2025: Defendant Rams Government Vehicles With His Car While Attempting to Evade Immigration Enforcement*

Defendant, an illegally present Mexican citizen, attacked federal law-enforcement officers with his car and was shot and arrested.  (ER-28; ER-57; ER-136.)  A self-described "citizen journalist," defendant had

---

[1]  "ER" refers to the government's Excerpts of Record; "CR" refers to the Clerk's Record in the district court and is followed by the docket number.

developed a following on TikTok by videorecording and streaming immigration enforcement activities in South Los Angeles. (CR 4 at 1, 5.) In June 2025, law enforcement saw defendant hiding in the back of a car that was following a government vehicle transporting a known gang member. (ER-85; ER-136.) Officers noticed contraband in the car and asked defendant (along with the driver and other passengers) to get out. (*Id.*) Once on the sidewalk, defendant was placed in handcuffs, but (with the help of a crowd that had gathered) he was able to escape into a different car and flee the scene. (*Id.*) After identifying him, officers determined that defendant was unlawfully present in the United States; an I-200 administrative warrant was issued for his arrest.[2] (ER-136.)

---

[2] An I-200 warrant is issued by U.S. Immigration and Customs Enforcement and signed by an immigration officer or judge. It authorizes the arrest of an alien for civil immigration violations. *See* 8 C.F.R. §§ 236.1(b), 287.5(e)(2)–(3).

Four months later, federal law enforcement attempted to execute that warrant. On October 21, 2025, defendant was driving near his residence when law enforcement vehicles surrounded his car, boxing him in. (ER-75–76.) In response, defendant accelerated his car, causing it to fishtail and ram into two government vehicles. (ER-76–78; ER-81.)



This time, however, defendant was unable to escape. Despite ramming the government vehicles, defendant remained boxed in. Agents cautiously approached defendant's car on foot, guns drawn, and broke the passenger-side window. (ER-76.) Defendant ignored agents' repeated commands to get out of his car; instead, he revved the engine once more, sending debris into the air and smoke billowing from his tires. (ER-76–78.) In the chaos, an agent attempting to open the passenger door with one hand (while holding his firearm with the other)

7

discharged his weapon, hitting defendant in the elbow; the bullet ricocheted and struck a deputy U.S. Marshal.[3]

### 2. Mid-November 2025: The Case is Assigned to District Judge Olguin, Who Immediately Orders Defendant Released on Bail and Preemptively Threatens to Dismiss the Case

The first four weeks of the case proceeded normally.  On the same day defendant attacked agents with his car, the government filed a criminal complaint charging him with assault on a federal officer, in violation of 18 U.S.C. § 111.  (ER-73; CR 1.)  The following day, October 22, 2025, Immigration and Customs Enforcement lodged an immigration detainer for defendant.  (ER-23.)  A week later, on October 31, 2025, a federal magistrate judge ordered defendant released on bond in the criminal case with certain conditions, including a requirement that he post a $5,000 cash deposit.  (ER-89–90.)  The government sought review of that order under 18 U.S.C. § 3145, and defendant's release was stayed.  (ER-82–88; CR 20, 46.)  The following week, on November 4, a grand jury returned an indictment charging defendant

---

[3] Body-camera footage of the incident received significant press coverage and was produced to the defense.  (ER-6; ER-130–132.)

with (1) assault on a federal officer using a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1),(b), and (2) depredation of government property, in violation of 18 U.S.C. § 1361. (ER-80–81.)

Two weeks later, on November 17, defendant was arraigned on the indictment, and the case was assigned to United States District Judge Fernando M. Olguin. (CR 32.) That was when the irregularities began. Four days after he was assigned the case, on November 21, 2025, Judge Olguin (without a hearing) vacated the stay and ordered defendant released forthwith. (ER-6; ER-206–08.) In his written order vacating the stay, he issued a preemptive threat:

> In the event defendant is not released forthwith, or if he is taken into custody by ICE or any other federal law enforcement agency following his release, defense counsel may file an ex parte application to dismiss the operative charging document.

(ER-207–08.) The district court further instructed that if defendant were to be taken into custody "by ICE or any other federal law enforcement agency following his release, the government shall **forthwith** file" a notice "explaining defendant's custody status, identify the facility where he is being detained, and specify the agency that has

9

custody over defendant." (*Id.* (bold underlining in original).)  The court set trial for December 30, 2025.  (CR 32.)

### 3. *Late November / Early December 2025: Defendant is Transferred to Immigration Custody 85 Miles Outside of Downtown Los Angeles, and Defense Counsel Unsuccessfully Attempts to Set Up a Videoconference With His Client*

On November 24, 2025—the next business day following the court's forthwith release order—the United States Marshals Service transferred defendant to ICE custody pursuant to the outstanding immigration detainer.  (ER-108–109.)  This was required by law: 8 U.S.C. § 1226(c)(1)(E)(ii), enacted by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), mandates detention of "criminal aliens" charged with, among other offenses, "assault of a law enforcement officer."  (*See* ER-138; *see also* ER-28.)  Defendant was transferred to the Adelanto ICE Processing Center, approximately 85 miles from the Federal Public Defender's downtown Los Angeles office.  (ER-108–109; ER-138.)

Adelanto's attorney-access protocols permit attorneys to schedule appointments up to one week in advance.  (ER-145–46.)  Alternatively, attorneys with a valid bar card can walk-in to visit their clients "24

hours a day, 7 days a week" on a first-come, first-served basis. (*Id.*) While such attorney appointments are normally limited to one hour, that time limit was waived in defendant's case. (*Id.*) Adelanto facility operators also offered to accommodate defense counsel's request to visit defendant between 8 a.m. and 8 p.m., and expressly stated that counsel could bring standard trial preparation materials including computers, external hard drives, and case files. (*Id.*)

But defense counsel never attempted to visit defendant in person—not once. (ER-13.) From the moment defendant arrived at Adelanto, counsel's stated position was that the 85-mile drive was too burdensome for "busy federal practitioners." (ER-9.) Defense counsel first claimed to have contacted Adelanto to set up a virtual meeting on December 2, 2025—eight days after defendant's transfer to immigration custody. (ER-120, 125.) At that point, the facility's scheduling coordinator, Ms. Camargo, had a backlog of calls; the operator directed defense counsel to leave a voicemail. (ER-8–9.)

11

### 4. First Hearing, Early December 2025: The District Court Fixates on the Bail Issue and Objects to Defendant's Civil Immigration Detention

The district court held its first hearing in this case on December 4, 2025, when the parties appeared for a status conference regarding the cash-deposit requirement that the magistrate judge had imposed as a bond condition. (ER-34, 37.) The AUSA and defense counsel each entered their appearances, with defense counsel noting for the record that defendant was on bond in the criminal matter but had been detained in immigration custody. (ER-36.) All that was standard. What followed was not.

The district court then announced, unprompted, that defendant should not be in civil immigration custody:

> So, we're here today to kind of figure out where things stand. You know on the one hand, the—*the defendant should not be in custody since he was given bond* . . . .

(ER-36–37 (emphasis added).) The district judge went on to note that, in his personal experience, a cash-deposit bond condition was unusual. (ER-37.) He next chastised the probation officer for sitting at government counsel's table. (ER-37–38.) Then he said that he was considering dismissing the indictment:

12

> I think the only thing to do at this point—but I want to hear from the parties—is to set a deadline for the payment of the—because I think it's a threshold issue before we get to the issue of whether or not he should even be in ICE custody or *whether or not I should dismiss the—the charging document because—because it's—you know, keeping him in ICE custody . . .*

(ER-38 (emphasis added).)  The district judge pulled out a document he claimed was an old government brief from sometime between 2001 and 2012—that had been "submitted to [him] when [he] was magistrate judge" (*id.*)[4]—and read aloud from it:

> And I'm quoting from the Government's brief.  And the case was *United States v. Banuelos.*  And I'm quoting, "The Government has not sought, nor does it intend, to detain defendant for this criminal prosecution through the civil detention mechanism available to ICE.  Rather, the Government has asked defendant be detained by the USMS," the Marshal Service.  "Continued detention by ICE would contravene ICE's statutorily prescribed mission of removal of criminal aliens from the country.  It would also contravene the statutes governing ICE's operation."
>
> That's your position, the Government's position that you've—that the Government made to me.  Granted, it was years ago, but things haven't really changed as far as ICE's role goes.

(ER-38–39.)

---

[4] *See* https://www.fjc.gov/history/judges/olguin-fernando-manzano (listing Judge Olguin's years of service as a magistrate judge) (last visited Apr. 20, 2026).

The court then addressed the AUSA personally, stating that he didn't "know how long [she'd] been at the office," or whether she was aware that the magistrate judge whose bail decision the government was challenging had previously served as Criminal Chief at the U.S. Attorney's Office, but that, in his opinion, the magistrate was "probably considered one of the more conservative magistrate judges on giving bail." (ER-40.) With that, the court imposed a four-day deadline for defendant to submit the cash deposit and set a hearing for the following day, December 9, "to see where—where things stand." (ER-43.)

5. ***Second Hearing, Early December 2025: The District Court Suggests That Defense Counsel Move to Dismiss the Indictment After Counsel Mentions Difficulties Scheduling a Videoconference with His Client***

On December 9, 2025, the parties returned to district court for the follow-up bail hearing. (ER-48–50.) Although the district court had sua sponte vacated the stay and ordered defendant released on bail two and a half weeks earlier, the government's previously filed detention request was still pending before the district court. That upset the district judge, who repeated his prior line of inquiry to the AUSA who was covering the hearing for her colleague:

14

> Before I start, though, I just wanted to note or wanted to ask how long you have been with the office, and do you know who Judge Chooljian is?

(ER-51.) The AUSA replied that she was aware that Magistrate Judge Chooljian had previously worked at the United States Attorney's Office. (*Id.*) The Court then snipped:

> So I'm just a little surprised that you guys are appealing her order, knowing that she knows your office far better than you do as far as that goes . . . But go ahead. It's your motion. Tell me how Judge Chooljian got it wrong.

(ER-52.) The bail hearing went forward, and the district court upheld the magistrate judge's bail decision. (ER-53–59.)

But the hearing did not end there. Instead, the court returned to the subject of defendant's immigration detention. It asked the AUSA: "why didn't the Government ask Judge Chooljian to make the relevant findings under Section 3142(d) to trigger the 10-day detention period?" (ER-60.) That question did not make sense—18 U.S.C. § 3142(d) is a notice-and-coordination provision that lets a federal court briefly hold a defendant for up to 10 days under a lower standard than is usually required for pretrial detention so that the government can notify other authorities (which was unnecessary here, since an immigration detainer

was already in place).[5] The AUSA replied, "I'm not really sure, Your

Honor." (ER-60.) The court then repeated its "view" of defendant's

immigration detention:

> So my view is that he should now be released, but it is the
> Government's position that he is going to remain in ICE
> custody through trial—to get, you know, through trial, or
> what is going to happen?

(ER-61.) The court then stated that it was concerned about defense

counsel's ability to meet with defendant to prepare for trial. (*Id.*) In

response, the AUSA attempted to explain that while she understood

that Adelanto was farther away than the Metropolitan Detention

Center downtown, the court's bail-release order and pre-existing

---

[5] As discussed *infra,* Section B(2), § 3142(d) applies not only to illegally present aliens but also to federal and state defendants on pretrial release, probation, or parole. It allows time for prosecutors to "notify the appropriate court, probation or parole official, or State or local law enforcement official, or the appropriate official of the Immigration and Naturalization Service," so that such official has the opportunity to "take such person into custody during that period." 18 U.S.C. § 3142(d).

Here, the civil immigration process *preceded* criminal charges; defendant committed the charged crimes during execution of the I-200 immigration warrant. So there was no need for a temporary, 10-day detention period in which to notify ICE of his unlawful presence in the country.

16

immigration detainer meant that the civil detention decision was not controlled by the prosecution. (ER-62.)

Defense counsel then mentioned that in the seven-day period between when he first reached out to Adelanto (December 2) and the bail-review hearing (December 9), his office had encountered logistical difficulties trying to schedule a videoconference:

> There is a process by which you can make an appointment but we haven't been successful at making an appointment. And in fact, when we have called the Adelanto detention facility, the person who answers the phone tells us that the appointment scheduler, whose name is Agent Camargo, that she's received a lot of complaints that Ms. Camargo has not been returning calls or scheduling legal visits.

(ER-63–64.)

In response, the district court proposed using that as a basis for a motion to dismiss the indictment:

> [W]hy not just file—and I would do it via ex parte, because the trial is coming up—file an ex parte to dismiss the Indictment, because, you know, defendant's continued immigration detention has jeopardized his constitutional and statutory rights to counsel because he's suffered undue hardship and inconvenience and that he has been denied the ability to meet with his attorney, [and] prepare for trial.
>
> I have seen cases where other judges do that . . . Why not just file that then?

17

(ER-64–65.)  Defense counsel accepted the court's invitation: "Your Honor, I think that is what we are going to do."  (ER-65.)  Defendant filed a motion to dismiss the very next day.  (ER-115.)

### 6. December 27, 2025: The District Court Grants the Dismissal Motion It Proposed—With Prejudice

Approximately two weeks later, on the Saturday after Christmas, the district court granted the dismissal motion it had previously proposed.  (ER-5–32.)  It never held a hearing.

The court first held that defendant's Sixth Amendment rights were violated by the bureaucratic obstacles defense counsel had encountered trying to set up a virtual meeting with defendant through Adelanto's scheduling system between December 2 and December 25, 2025.  (*See* ER-7–12.)[6]  Following the December 9 bail hearing, defense counsel had continued to seek a virtual meeting with defendant: on December 12, defense counsel's legal assistant emailed Adelanto requesting a virtual meeting on December 16.  (ER-180.)  She received an email response two minutes later from an email address associated

---

[6] Although defense counsel filed his motion to dismiss on December 10, the district court's opinion covered the next two weeks as well.

18

with the private, third-party contractor that operated the Adelanto facility, providing instructions for setting up an appointment. (*Id.*) On December 15, defense counsel was told that, as criminal defense attorneys (as opposed to immigration attorneys), they needed prior ICE authorization to schedule communications. (ER-10–11.) They obtained authorization later that day but were unable to book a call before Christmas Day—only five days before trial. (ER-170.) The next day, on December 16, an ICE administrator emailed back an apologetic response noting a high volume of attorney visits and acknowledging that a videoconference slot might not be available prior to defendant's December 30 trial date. (ER-188.)

Based on defense counsel's inability to electronically communicate with their client, the district court concluded that defendant was "effectively denied access to his counsel for nearly the entire month preceding trial." (ER-16.) The court excused the fact that defense counsel never attempted to visit defendant in person (even though walk-in appointments were available) on the ground that the 85-mile distance was too burdensome, based on a "GPS map" screenshot "reflecting driving directions generated at 3:48 p.m." during rush-hour

19

traffic. (ER-16; ER-173.) *But see United States v. Lucas,* 873 F.2d 1279, 1280 (9th Cir. 1989) (rejecting a similar Sixth Amendment access-to-counsel claim based on a significantly longer distance—120 miles—between the defendant's pretrial detention facility and his lawyer's office).[7]

The court also faulted the government for what it considered to be discovery delays. For instance, it criticized the government for producing initial discovery on November 26, 2025—even though that was before the December 5 discovery-cutoff date and only one day after the court belatedly issued its own case-management order.[8] (ER-13.) The district court also pointed out that the government had not

---

[7] The district court attempted to distinguish *Lucas* by claiming that a 120-mile commute between Phoenix and Tucson "nearly 40 years ago" is "clearly not the situation today" because the 85-mile drive from Los Angeles to western San Bernardino County can sometimes exceed three hours in rush-hour traffic. (ER-16–17.)

[8] The court excused its own three-week delay in issuing its case-management order, blaming it on slow docketing during the lapse in appropriations (during which government counsel were also not paid). (ER-13 n.8; *see also* ER-96.) It further faulted the prosecution for not anticipating the court's scheduling order, asserting without any basis (and incorrectly) that the U.S. Attorney's Office has a "chart and/or system in place that sets forth the deadlines and requirements for all the judges." (ER-13 n.8.)

20

produced the body camera footage in its entirety until December 10, 2025, claiming that this "eliminated any possibility for the defense to review the footage with Mr. Parias." (*Id.*) (That premise was incorrect: December 10 was still six days before the December 16 VTC meeting defense counsel had proposed. (*See* ER-180).)

The court then turned to the issue it had twice raised sua sponte during the two hearings: whether defendant was properly detained pending his civil removal proceedings following his release on bail in the criminal case. (ER-19–29.) Relying heavily on *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167 (D. Or. 2012)—a decision the government did not appeal to this Court, but which has been rejected by every court of appeals to consider it—the district court described the "interplay between the BRA and INA" as causing "confusion and tension." (ER-19.) It fixated on the 10-day detention provision in 18 U.S.C. § 3142(d), which it mischaracterized as "provid[ing] a specific framework to allow the government to prioritize removal proceedings over criminal prosecution." (ER-20–22.) The court concluded that the transfer of defendant into ICE custody after he had been released under the BRA "disrupt[ed] the balance between prioritizing prosecution or

21

removal." (ER-23.) It rejected the government's reliance on a seven-circuit consensus to the contrary as "non-binding" and "inapposite." (ER-25–26.) The court also faulted the two Executive Branch agencies at issue—the Department of Justice and the Department of Homeland Security—for failing to "coordinate their respective efforts." (ER-25 (quoting *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111–12 (D. Minn. 2009)).)

The district court went on, however, to simultaneously fault the prosecution for "coordinat[ing]" with immigration authorities. (ER-27.) The court stated that it was "clear" ICE was holding defendant for the impermissible purpose of securing his presence at trial. (ER-25, 27.) As support for this finding, it pointed to the prosecution's statement that it was working with DHS "to ensure defendant's transportation from ICE custody to criminal proceedings in this matter" (ER-27), as well as the fact that defendant, a Mexican citizen, had not been removed within "48 hours." (ER-28 n.17.)[9] The court also cited a Ninth Circuit case about

---

[9] The court stated that "prior orders of removal [] can be quickly reinstated," ER-28 n.17, but defendant had no prior order of removal—his was an initial civil arrest on an I-200 warrant. (ER-23.)

computing sentencing credits. (ER-27–28 (citing *Zavala v. Ives*, 785 F.3d 367, 372 (9th Cir. 2015)).)

Having concluded that defendant's civil detention under the Immigration and Nationality Act was unlawful and done to subvert his release under the Bail Reform Act, the court then turned to the issue of remedy. It dismissed the government's proposed remedies, including a continuance of the December 30 trial date—even though, as a result of defendant's motion to dismiss, there was still a month left under the Speedy Trial Act—because that would force defendant "to choose between his constitutional rights." (ER-30.)[10] It further stated that remedies less than dismissal "would do nothing to address ICE's practice of denying criminal defense attorneys equivalent access to their clients in ICE custody as is provided to immigration attorneys" and

---

[10] Defendant made his initial appearance on the complaint on October 27, 2025; he was indicted on November 4, 2025. *See* 18 U.S.C. § 3161(c)(1) (speedy trial clock runs from the date of a defendant's initial appearance or filing date of indictment, whichever date last occurs). His motion to dismiss was pending from December 10 to December 27, 2025, adding 17 days of time under 18 U.S.C. § 3161(h)(1)(D). This means that defendant's speedy trial clock would not have expired until January 30, 2026—exactly one month after the December 30 trial date set in the case.

would not "cure ICE's apparent inability or refusal to accommodate criminal defense counsel's requests for VTC or legal calls in a reasonably timely manner." (ER-29–30.)

Having concluded that "the deprivation of Mr. Parias's access to counsel during the critical period prior to his trial caused him actual and threatened prejudice, and [that] no other remedy could adequately cure his deprivation," the court concluded "that dismissal of the indictment [was] warranted." (ER-30.) It further concluded that the dismissal should be with prejudice, reasoning that this extreme sanction was justified because a dismissal without prejudice would "risk[] repeating the same prejudice against Mr. Parias, and unjustly allow[] the government a second opportunity to correct its prosecutorial shortcomings." (ER-31.) Although the court had never heard from any witnesses or seen the trial evidence, it declared that re-prosecution would improperly permit the government to "salvage what appears to be a poorly conducted prosecution." (*Id.*)

The government appeals.

## IV

## SUMMARY OF ARGUMENT

Dismissal with prejudice—at the outset of the case—was an abuse of the district court's discretion and supervisory powers. The district court was entitled to ensure that defendant had a fair opportunity to consult with counsel and prepare for trial. It was not entitled to use that concern to permanently bar a prosecution it did not approve of— especially when narrower remedies were available, any asserted prejudice was temporary, and the court's reasoning was infected by a fundamental misreading of the Bail Reform Act.

The district court misunderstood the relationship between criminal bail and civil immigration detention. The Bail Reform Act and the Immigration and Nationality Act do different things, for different reasons, through different agencies, under different standards applied by different decision-makers. The BRA allows criminal defendants to be detained pending trial when there are no release conditions that can ensure their appearance before the court or the safety of the community; the INA allows—and in certain cases, like this one, *requires*—unlawfully present aliens to be detained pending their

25

removal from the country. A person can be detained under the BRA but not the INA, or vice versa. The two statutory schemes run on separate, parallel tracks. *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019); *United States v. Lett,* 944 F.3d 467, 470–71 (2d Cir. 2019).

The district court's core legal error was that it misread 18 U.S.C. § 3142(d) as constraining immigration authorities' independent detention authority under the INA. And because it mistakenly believed that release under the BRA foreclosed any possibility of civil immigration detention—essentially, that its own bail-release decision overrode the laws governing defendant's unlawful presence in this country—the district court perceived defendant's custody at the ICE detention center in Adelanto as an affront to its authority. That was wrong, as every circuit to address this issue has held. *See United States v. Soriano Nunez*, 928 F.3d 240, 245 (3d Cir. 2019) ("No court of appeals that has examined this assertion has concluded that pretrial release precludes pre-removal detention"); *see also, e.g., United States v. Ventura*, 96 F.4th 496, 501 (2d Cir. 2024) ("ICE's detention of a criminal defendant ordered released under the BRA is lawful *per se*.").

26

Further, even assuming a Sixth Amendment violation occurred, the district court abused its discretion in dismissing the indictment with prejudice under its supervisory powers. Dismissal is an extreme remedy appropriate only as a last resort: where defendant suffered "substantial prejudice" and "no lesser remedial action is available." *Chapman,* 524 F.3d at 1087 (citation omitted); *see also Morrison,* 449 U.S. at 364 (remedies for constitutional violations "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests").

The record in this case did not come close to satisfying those standards. Any prejudice stemming from access-to-counsel issues defendant encountered in December 2025 was neither permanent nor irreparable. Rather, it was tethered to a looming trial date, set over the holidays, barely eight weeks after the offense occurred. At the time of dismissal, the case had not been continued even once, and a month remained on the speedy-trial clock. Continuance of the trial date would have addressed the access problem directly. So too would expecting defense counsel to drive to Adelanto and meet with defendant in person. *See Lucas,* 873 F.2d at 1280. And yet the district court rejected any

27

less-drastic course and leapt straight to dismissal *with prejudice*—not because lesser remedies were unavailable, but because the court wanted to strike a blow against ICE.  That was overreach.

A district court does not have authority to permanently bar a federal criminal prosecution because it disagrees with the grand jury's charging decision or with the Executive Branch's immigration policy more generally.  Yet that is what the district court did here.  What's more, it justified its decision based on legal error: its misunderstanding of the criminal and civil detention framework enacted by Congress.  Dismissal of this case with prejudice was an abuse of the court's supervisory powers—and an abuse of its discretion.  This Court should reverse.

## V

## ARGUMENT

A district court may exercise its supervisory power in limited circumstances to "oversee [its] own affairs to ensure that justice is done."  *United States v. Simpson*, 927 F.2d 1088, 1089 (9th Cir. 1991).  Supervisory powers are not, however, a "license to intrude into the authority, powers[,] and functions of the coordinate branches."  *Id.*

28

The district court ran afoul of that principle here—deliberately. (*See* ER-25 ("The government's decision to detain Mr. Parias in Adelanto does not mean, however, that this Court is powerless to prevent the Executive Branch from ignoring its obligations.").) Its dismissal order should be reversed.

## A. Standard of Review

Dismissal of an indictment under a district court's supervisory powers is reviewed for abuse of discretion. *Chapman*, 524 F.3d at 1086. "Any legal issues predicating the district court's dismissal" are subject to de novo review; underlying findings of fact are reviewed for clear error. *United States v. Bundy,* 968 F.3d 1019, 1030 (9th Cir. 2020).

## B. Civil Detention by Immigration Authorities Following Release on Bail in Criminal Proceedings Is Not Unlawful, Let Alone Government Misconduct

During two different bail hearings in early December 2025—before any cognizable Sixth Amendment violation had occurred—the district court repeated its view that defendant should not be detained in ICE custody given his prior release under the Bail Reform Act. (ER-37–39; ER-61, 64–66.) It devoted ten pages in its dismissal order to explaining this position, analyzing the "interplay between the BRA and

29

the INA" before ultimately holding that defendant's immigration detention "disrupt[ed] the balance between prioritizing prosecution or removal" and thus gave rise to a constitutional violation.[11] (*See* ER-19–29; *id.* at 21 ("[T]he government's decision to administratively detain Mr. Parias in Adelanto is when and where the constitutional violations began in this case.").)

That analysis was wrong on four independent grounds. The district court misunderstood the basic relationship between the BRA and INA. The district court misread 18 U.S.C. § 3142(d). The district court misapplied caselaw, including this Court's decision in *United States v. Santos-Flores,* 794 F.3d 1088 (9th Cir. 2015). And the district court misconstrued the record, finding that because the government had coordinated defendant's transportation from ICE custody to federal court for hearings, immigration officials must have therefore detained defendant for the impermissible purpose of subverting his release under the BRA.

---

[11] The district court stopped short of expressly holding that ICE's detention of defendant violated his statutory right to release under the BRA, as it held in a related case that the government is also appealing. *See United States v. Arreola-Arreola,* C.A. 25-5471.

Each error standing alone warrants reversal. Together, they reflect a decision not only unmoored from controlling authority, but driven by the court's own fixation—evident from the outset of these proceedings—with ICE's detention of defendant under the civil immigration laws.

### 1. The Bail Reform Act and Immigration and Nationality Act Run on Parallel, Independent Tracks

Courts may not "pick and choose among congressional enactments." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Absent a clear contrary congressional intent, they must give effect to both statutes. *Id.*; *cf. Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 510 (2018) (the party claiming that one statute displaces another has a "heavy burden" to show a "clear and manifest" congressional intent for one statute to override another). That principle governs this case, which involves two separate—but co-existing—statutory schemes.[12]

---

[12] As noted, the government has also briefed this issue in *Arreola-Arreola*, a government appeal arising from another dismissal with prejudice by the same district judge on the same BRA/INA grounds—objecting to a defendant's civil detention in ICE custody following release on bail in criminal proceedings. (C.A. 25-5471, Dkt. 8 at 18–23.) Following the defendant's removal to Mexico in that case, however, defense counsel has refused to file an answering brief.

The Bail Reform Act and Immigration and Nationality Act apply simultaneously where, as here, an alien faces both criminal prosecution and civil removal proceedings. The BRA governs whether a judge may order a criminal defendant detained before trial. 18 U.S.C. §§ 3141–43. The INA, by contrast, governs whether the Department of Homeland Security may detain and remove aliens who are not lawfully present in the country. 8 U.S.C. § 1226(a). These are "separate functions that serve separate purposes and are performed by different authorities." *Diaz-Hernandez*, 943 F.3d at 1199 (quoting *Vasquez-Benitez*, 919 F.3d at 552).

The statutes also differ in their scope of applicability. The INA authorizes immigration detention before a criminal case begins, 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a), *or* after such a case and any related detention or confinement. *Id.* §§ 1226(c)(1)(E), 1231(a)(1)(B)(iii) and (a)(2). There need not be a criminal case at all. The BRA, by contrast, deals with criminal proceedings, and authorizes detention only during pendency of a criminal case. 18 U.S.C. §§ 3141–43.

If someone who is a noncitizen (and not a national of the United States) is charged in a federal criminal case, the BRA and the INA each

32

confer separate, but interlocking and compatible, detention authorities. The BRA requires the district court to decide at the outset if the alien may flee or endanger others if released before trial. 18 U.S.C. § 3142(d). If the court deems the alien a flight risk or dangerous, it must detain him for ten days and direct the prosecutor to notify immigration officials. *Id.*; *Santos-Flores*, 794 F.3d at 1091 & n.2. Those officials may, if statutorily authorized, then detain the alien. If they "fail[] or decline[]" to do so, the court will weigh whether to detain the alien under "other provisions of [Section 3142], notwithstanding the applicability of other provisions of law governing release pending trial or [removal] proceedings." 18 U.S.C. § 3142(d). If the alien is so detained, immigration officials cannot remove him (or detain him for purpose of removal) until his release from any criminal detention or imprisonment. 8 U.S.C. §§ 1226(c)(1), 1231(a)(1)(B)(iii).

The district court may alternatively order an alien defendant's release under the BRA, but such an order has no preclusive effect on immigration officials' detention authority. Indeed, "the BRA does not give the district court authority to interrupt ICE's independent statutory obligations to take custody of [an alien] once he is released."

33

*United States v. Barrera-Landa*, 964 F.3d 912, 918 (10th Cir. 2020); *see also Vasquez-Benitez*, 919 F.3d at 553. Rather, the court's BRA release order opens the door to immigration detention during a criminal case. If parallel immigration proceedings have not produced a final removal order or if a court stays such an order, immigration officials generally have discretionary detention authority, *see* 8 U.S.C. § 1226(a), although in some cases—as here—detention is mandatory. *See id.* § 1226(c)(1). Or, if a final, enforceable order of removal has issued, an alien's non-detention will trigger the INA's edict that officials "shall detain" him for 90 days as they remove him. *Id.* § 1231(a)(1)(B)(iii), (2)(A).

The alien's criminal case remains pending during any such immigration detention. Immigration and law enforcement officials will facilitate his transport to federal court for hearings and consultation with his criminal defense attorney. *See, e.g.*, *Vasquez-Benitez*, 919 F.3d at 550 (writ of habeas corpus ad prosequendum used to bring defendant to federal court). If officials remove the alien before jeopardy has attached, the government usually moves to dismiss the case without prejudice. *See* Fed. R. Crim. P. 48(a). If jeopardy has attached, the government may move to hold sentencing in abeyance and

34

administratively close the criminal case. *Cf. Betterman v. Montana*, 578 U.S. 437, 439 (2016) (no post-conviction speedy-trial right). But removal proceedings end, and federal criminal proceedings lay dormant, unless and until the removed alien reenters the United States.

"Congress has never indicated that the BRA is intended to displace the INA." *Vasquez-Benitez*, 919 F.3d at 553; *see also United States v. Pacheco-Poo*, 952 F.3d 950, 952 (8th Cir. 2020) (explaining that "[t]he BRA and INA can coexist" because "the BRA does not have any clearly expressed intention to subordinate the INA"). Indeed, displacing the INA would not make sense: most aliens are not criminals, and most criminals are not aliens. The BRA and INA are separate statutory schemes applying to different groups of people. And when, as here, a person is both an alien and a criminal defendant, nothing in the text of either statutory scheme compels the Executive Branch to choose between removal and prosecution. *See Lett*, 944 F.3d at 471. "Nor can the courts order the Executive Branch to choose between criminal prosecution and removal." *Id.*; *accord Soriano Nunez*, 928 F.3d at 246 ("[N]othing in the BRA gives a district court the authority to compel

35

another sovereign or judge in federal administrative proceedings to release or detain a defendant.").

Every court of appeals to address the interplay between the BRA and INA—the Second, Third, Fifth, Sixth, Eighth, Tenth, and D.C. Circuits—has reached the same conclusion: an alien defendant's release under the BRA does not bar civil detention under the INA for removal purposes. *See United States v. Lett*, 944 F.3d 467, 470–71 (2d Cir. 2019); *United States v. Soriano Nunez*, 928 F.3d 240, 245–46 (3d Cir. 2019); *United States v. Baltazar-Sebastian*, 990 F.3d 939, 941, 945 (5th Cir. 2021); *United States v. Veloz-Alonso*, 910 F.3d 266, 269–70 (6th Cir. 2018); *United States v. Pacheco-Poo*, 952 F.3d 950, 952 (8th Cir. 2020); *United States v. Barrera-Landa*, 964 F.3d 912, 918–19 (10th Cir. 2020); *United States v. Vasquez-Benitez*, 919 F.3d 546, 552–53 (D.C. Cir. 2019). This Court should join them.

Ninth Circuit precedent is in accord. Indeed, this Court has already concluded that the BRA and INA run on separate tracks, holding that a district court may not detain a defendant under the BRA merely because immigration officials have filed a detainer or might later exercise their removal authority. *Diaz-Hernandez*, 943 F.3d at

36

1199; *Santos-Flores*, 794 F.3d at 1090–91.  The INA analysis does not govern the BRA.  Conversely, a release order under the BRA cannot have preclusive effect on immigration officials' independent detention authority under the INA, which precedes and exists independently of a federal criminal case.  *See Veloz-Alonso*, 910 F.3d at 270 (reversing order enjoining ICE from detaining defendant under the INA because "ICE may fulfill its statutory duties under the INA to detain an illegal alien pending trial or sentencing regardless of a BRA release determination"); *accord Barrera-Landa*, 964 F.3d at 918; *Lett*, 944 F.3d at 470; *Vasquez-Benitez*, 919 F.3d at 553.

The district court, however, dismissed this wall of authority.  It reasoned that all seven decisions from the other circuits were "inapposite" because they "say nothing about the district court's authority to craft appropriate remedies for constitutional violations occasioned by the administrative detention of a criminal defendant." (ER-26.)  That is a non-sequitur.  It is also a fig leaf—the court's fixation on immigration detention authority existed prior to, and separate from, any Sixth Amendment violation in this case.  (*See* ER-36–37; ER-61, 64–67.)  In fact, the court *preemptively* threatened to

37

dismiss the indictment on BRA grounds before defendant had even been detained by ICE. (ER-207–08.) And it re-affirmed its position—"the defendant should not be in [immigration] custody since he was given bond"—at the earliest opportunity, following the entry of appearances at the first hearing. (ER-36–38.)

Nor was the court's dismissal order limited to a narrow Sixth Amendment holding. Rather, the court spent ten pages analyzing the interplay between the BRA and INA before concluding that the government had "reversed its priorities" and impermissibly prioritized removal over criminal prosecution by taking defendant into ICE custody while criminal proceedings were pending. (ER-23.) To be sure, the court used the Sixth Amendment as a hook for its underlying concern— "Why not just file that then?" (ER-65)—but its decision was rooted in its BRA/INA analysis, and it never explained why the seven circuits rejecting its position were wrong. They were not. It was the district court that erred.

38

### 2. Section 3142(d) is a Notice Provision; It Does Not Constrain Immigration Officials' Independent Detention Authority

The district court's misunderstanding of the relationship between the BRA and INA traces back to a foundational mistake—its misreading of 18 U.S.C. § 3142(d). That section of the BRA provides a short-term detention period of up to 10 days for federal criminal defendants who may be subject to detention by some other (state or federal) authority:

If the judicial officer determines that—

(1) [a] person . . .

> (A) is, and was at the time the offense was committed, on—

>> (i) release pending trial for a felony under Federal, State, or local law;

>> (ii) release pending imposition or execution of sentence, appeal of sentence or conviction, or completion of sentence, for any offense under Federal, State, or local law; or

>> (iii) probation or parole for any offense under Federal, State, or local law; or

> (B) is not a citizen of the United States or lawfully admitted for permanent residence . . .; and

(2) such person may flee or pose a danger to any other person or the community;

39

> such judicial officer shall order the detention of such person, for a period of not more than ten days . . . and direct the attorney for the Government to notify the appropriate . . . official of the [state or federal authority]. If the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings.

18 U.S.C. § 3142(d).

The district court incorrectly believed that this provision required the government to choose, *ex ante*, between prosecution and removal. (ER-20–23.) It reasoned that because the government had sought detention under §§ 3142(e)–(f) rather than under § 3142(d),[13] the BRA's "dichotomous" framework was disrupted by ICE's later detention of defendant—and holding defendant in immigration custody was therefore unlawful. (*Id.*; *see also* ER-60 (court commenting that "it does

---

[13] Remarking that "the government was well aware of the distinct pathways available to them in this case," the court flagged that § 3142(d)'s temporary 10-day detention period was the "first option listed" on the government's form Notice of Request for Detention and yet the government "did not check that box." (ER-21 n.12.) That the court viewed this as an oversight confirms its misreading of § 3142(d), which was unnecessary to invoke because an ICE detainer for defendant was already in place.

not appear that the Government availed itself of the temporary 10-day detention authorized by Section 3142(d) to allow the relevant immigration officials to detain defendant if the Government agencies decided to proceed with deportation rather than prosecution").)

Every part of that analysis was wrong. Section 3142(d) is a notice-and-coordination provision. It gives the government a lower standard for detention for up to ten days to give prosecutors time to notify a defendant's probation or parole officer, a court in another jurisdiction where defendant is awaiting trial, or immigration authorities. 18 U.S.C. § 3142(d). It is not specific to the immigration context. To the contrary, its inclusion of state judicial authorities alongside federal immigration officials underscores Congress's concern that these other officials—including those from another sovereign or supervising authority—have the opportunity to exercise their own independent detention authority. *See Santos-Flores*, 794 F.3d at 1090–91. If those other authorities decline to take custody within that 10-day period, then the standard framework applies. 18 U.S.C. § 3142(d).

Circuit courts have uniformly interpreted § 3142(d) this way. As the Second Circuit explained, § 3142(d) simply "has no bearing on

immigration officials' authority to detain an alien defendant." *Lett*, 944 F.3d at 472; *accord Baltazar-Sebastian*, 990 F.3d at 945–46 (collecting cases); *Barrera-Landa*, 964 F.3d at 922–23. Yet the district court held otherwise, erroneously treating § 3142(d) as the *exclusive* source of immigration detention authority during the pendency of a criminal case. That makes no sense—it is a *criminal* detention provision. The government's decision not to invoke § 3142(d) does not forfeit the INA's independent authority to civilly detain an illegally present alien for purposes of removal; immigration officials may lawfully detain a removable alien before, during, and after a criminal case. *See* 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a). Under the district court's interpretation, a notice provision in Title 18 would implicitly vitiate detention authority set forth in Title 8. That cannot be right. *See Veloz-Alonso*, 910 F.3d at 270 ("Reading the BRA's permissive use of release to supersede the INA's mandatory detention does not follow logically nor would doing so be congruent with our canons of statutory interpretation.").

The district court's reading of § 3142(d)'s "notwithstanding clause" was similarly flawed. (ER-22.) This clause provides that if ICE fails to

42

take custody within the 10-day period, the alien "shall be treated in accordance with the other provisions of [Section 3142], notwithstanding the applicability of other provisions of law governing release pending trial or deportation."  18 U.S.C. § 3142(d).  The district court took this to mean that once a defendant is released under the BRA, immigration officials lose the power to act.  (ER-22–24.)  Wrong again.  This clause is not a use-it-or-lose-it provision; it merely specifies what happens when the 10-day period lapses—and provides that a defendant's removability alone cannot justify continued detention under the BRA.  That is entirely consistent with *Santos-Flores* and *Diaz-Hernandez*.  As the Second Circuit correctly recognized, the clause imposes no constraint on the INA.  *See Lett*, 944 F.3d at 472 (stating that the "notwithstanding clause" does not "preclude detaining a defendant under the INA").  They are independent.

Finally, as the district court acknowledged in a footnote, this was a case where civil immigration detention was mandatory.  In 2025, the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), amended the INA to require detention of aliens charged with, *inter alia*, assaulting a law enforcement officer.  8 U.S.C. § 1226(c)(1)(E)(ii).  Thus, not only was

43

defendant's immigration detention lawful under the INA, *it was mandated by Congress*. The district court's passing suggestion in a footnote that the Laken Riley Act "appears to invade the province of the BRA" (ER-28 n.16) cannot be a serious separation-of-powers holding. Nor did any party raise such an issue.

The fact that ICE was legally required to detain defendant should alone defeat any claim (or attempt at a factual finding) that the government acted with an impermissible purpose by holding defendant in immigration custody. (ER-26–29.) And it is all the more reason why the court abused its discretion in exercising its supervisory powers to block this criminal prosecution entirely. *See Simpson*, 927 F.2d at 1090 ("Unless the law enforcement officers break the law, the court has no authority [under supervisory powers] to sanction them."); *cf. United States v. Myers*, 692 F.2d 823, 847 (2d Cir. 1982) (supervisory power does not entitle judges to fashion sub-constitutional limitations on the conduct of law enforcement agents).

44

### 3. The District Court Misapplied Caselaw

#### a. Santos-Flores *supports the government's—not the district court's—position in this case*

In addition to misreading § 3142(d), the district court misapplied precedent. Specifically, it relied on this Court's decision in *United States v. Santos-Flores,* 794 F.3d 1088 (9th Cir. 2015), but if anything, that decision supports the government's position. *See Barrera-Landa,* 964 F.3d at 920.

*Santos-Flores* makes clear that BRA and the INA operate as independent statutory regimes. The question in *Santos-Flores* was whether the possibility of removal or immigration detention could justify pre-trial *criminal* detention of an alien under the Bail Reform Act. *Santos-Flores*, 794 F.3d at 1090–91. This Court held that it could not. *Id.* at 1091–92. A prohibition on using removal-based arguments to detain an alien under the BRA, however, says nothing about whether ICE may exercise its own detention if the alien defendant is released under the BRA.

The district court first relied on *Santos-Flores* for a "principle" (which it said was "no less important here") that "the government may not use its discretionary power of removal to trump a defendant's right

45

to an individualized determination under the Bail Reform Act." (ER-24 (quoting *Santos-Flores,* 794 F.3d at 1091).) While that is true, as just noted, it is not relevant here. *Santos-Flores* was concerned with the "categorical denial of bail" under the BRA based on the prospect of an alien defendant's removal proceeding or immigration detention, which might make him less likely to appear in court. 794 F.3d at 1092. Here, defendant unquestionably received an individualized bail determination under the BRA—and was released irrespective of the immigration proceedings. Consistent with *Santos-Flores*, the government did not seek detention under the BRA on the ground that defendant was a removable alien. Rather, the government properly treated bail analysis and immigration detention as distinct. It was the district court that missed the point.

The district court's invocation of *Santos-Flores's* language regarding remedies fares no better. Specifically, the court homed in on *Santos-Flores's* observation that "if the government, by placing [defendant] in immigration detention or removing him, jeopardizes the district court's ability to try him, then the district court may craft an appropriate remedy." (ER-25 (quoting *Santos-Flores,* 794 F.3d at

46

1091).)  But *Santos-Flores* did not involve a Sixth Amendment claim or a motion to dismiss.  It did not even involve actual immigration detention, let alone any prejudice flowing from such; the defendant in *Santos-Flores* was detained under the BRA based on the "*possibility* of his detention or removal by immigration authorities."  794 F.3d at 1091 (emphasis added).  Thus, at most, the "appropriate remedy" language reflects a general acknowledgment that a district court retains equitable discretion to craft appropriate remedies.  It does not support the court's exercise of supervisory powers to dismiss this case—which was manifestly *not* "an appropriate remedy," as discussed below.

Finally, the district court placed substantial weight on the fact that *Santos-Flores* cited *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167 (D. Or. 2012), equating its "see, e.g." citation with "approval" of *Trujillo*'s roundly rejected statutory interpretation.  (ER-25 & n.13.) That proves far too much.  *Santos-Flores* cited *Trujillo* for the proposition that "the risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition," meaning that a defendant should not be detained under the BRA because ICE might deport him. As noted above, that is not in dispute.  *Santos-Flores* did not adopt

47

*Trujillo*'s reading of the INA, or the district court's misreading of its interplay with the BRA. And *Santos-Flores* certainly did not hold, or even imply, that immigration detention of a BRA-released alien is per se unlawful.

### b.  Trujillo-Alvarez *was wrongly decided*

Fourteen years ago, a district court in Oregon held that where the government brings criminal charges against a removable alien, once the alien is released under the BRA, immigration officials may not detain him in pursuit of removal—and that any such detention is, by definition, an impermissible attempt to circumvent the BRA. *Trujillo*, 900 F. Supp. 2d at 1179. As noted, that decision has since been rejected by seven different circuits—every circuit to have addressed it—on grounds that *Trujillo*'s statutory reading of the INA cannot be reconciled with the statute's text, history, structure, or regulatory framework. *See Baltazar-Sebastian*, 990 F.3d at 945–46; *Barrera-Landa*, 964 F.3d at 918; *Pacheco-Poo*, 952 F.3d at 952; *Lett*, 944 F.3d at 470; *Soriano Nunez*, 928 F.3d at 245; *Vasquez-Benitez*, 919 F.3d at 552; *Veloz-Alonso*, 910 F.3d at 267. This Court should do the same. *Trujillo*

48

is wrong for multiple reasons—and the district court in this case was wrong to import it wholesale.

*First*, *Trujillo* misinterpreted 18 U.S.C. § 3142(d) as an election provision that forces the government to choose between prosecution and removal at the outset of a criminal case. 900 F. Supp. 2d at 1179. As explained above, the statute says no such thing. Section 3142(d) is a notice provision that gives other officials ten days to take custody or issue a detainer before a BRA release order issues. *See Lett*, 944 F.3d at 472. Its "notwithstanding clause" governs how the court applies the BRA's own standards, not whether ICE retains independent authority to act later. *Id.* Seven circuits have confirmed this reading. *See Baltazar-Sebastian*, 990 F.3d at 945–46 (collecting cases); *Barrera-Landa*, 964 F.3d at 922–23. This Court should similarly reject *Trujillo*'s (and the district court's) contrary—and atextual—position.

*Second*, *Trujillo* incorrectly read 8 U.S.C. § 1231(a)(1)(B)(iii) as preventing immigration officials from removing a BRA-released alien during a pending criminal case. 900 F. Supp. 2d at 1174–75. That provision pauses immigration officials' duty to remove an alien while the alien is "detained or confined" under non-immigration process, and

49

restarts the 90-day removal clock upon "release[] from detention or confinement."  8 U.S.C. § 1231(a)(1)(B)(iii).  *Trujillo* treated a defendant released with conditions as "confined" within the meaning of the statute—importing a more expansive notion of habeas "custody" to reach a defendant released on bond.  900 F. Supp. 2d at 1175.  But that cannot be squared with the ordinary meaning of "detention" or "confinement."

The term "detention" denotes physical restraint pending the disposition of a matter by a court or administrative agency.  *See Jennings v. Rodriguez*, 583 U.S. 281, 307–09, 311 (2018) ("detain" and "detention" in immigration statutes signal physical restraint); *cf. Khatib v. County of Orange*, 639 F.3d 898, 903 (9th Cir. 2011) (explaining that "detention" carries this pre-decisional connotation).  The term "confinement" denotes physical restraint after that process has concluded.  *See Confinement*, Black's Law Dictionary 370 (4th ed. 1951) ("[A] moral or physical restraint, by threats of violence with a present force, or by physical restraint of the person."); *cf.* 8 U.S.C. § 1231(a)(4)(B) ("confined pursuant to a final conviction").  Neither term has ever described an alien released on bond.  *See Reno v. Koray*, 515

50

U.S. 50, 56 (1995) (BRA-released defendant at community treatment center not in "official detention"); *Jennings*, 583 U.S. at 312.

*Trujillo*'s interpretation also produces an absurd result: on its view, aliens on parole or supervised release would be immune from removal under § 1231(a)(1)(B)(iii), even though § 1231(a)(4)(A) expressly provides that parole and supervised release "shall not be a reason to defer removal." Statutes must be read to avoid such internal conflict. *Jones v. Hendrix*, 599 U.S. 465, 478 (2023).

*Third*, *Trujillo* wrongly relied on immigration regulations governing the voluntary departure of aliens from the United States to find that the Executive Branch had prioritized criminal proceedings over removal and that immigration officials could not detain aliens released under the BRA. *See* 900 F. Supp. 2d at 1178–79 (citing 8 C.F.R. §§ 215.2(a), 215.3(g)). As other courts of appeals have recognized, "these regulations merely prohibit aliens who are parties to a criminal case from departing the United States *voluntarily*." *Lett*, 944 F.3d at 472 (emphasis in original). "[T]hey do not affect the government's authority to *deport* such aliens pursuant to final orders of removal." *Id.* at 473 (same); *accord Baltazar-Sebastian*, 990 F.3d at

51

946. Throughout the INA, "departure" and "removal" are distinct legal terms. *See, e.g.*, 8 U.S.C. § 1101(a)(13)(C)(iv); *id.* § 1229c(a)(1). *Trujillo* improperly conflated the two.

Finally, even accepting *Trujillo*'s misguided reading of the immigration laws would still fall short of establishing a deliberate BRA violation. Immigration detention during a criminal case does not, without more, prove that officials detained an alien to subvert his right to release under the BRA. *See Ventura*, 96 F.4th at 501 (defendant seeking dismissal bears the burden to show that immigration officials detained him to circumvent the BRA).

### 4. The District Court's Impermissible-Purpose Finding Was Clear Error

The district court's BRA/INA analysis culminated with the conclusion that defendant "is being detained by ICE for the purpose of securing his presence at his ongoing criminal prosecution." (ER-27–28.) This finding—equating mandatory immigration detention with bad-faith conduct—was clear, reversible error. Defendant was subject to an immigration detainer because he is unlawfully present in the United States. And he was taken into immigration custody following his release on bond because the Laken Riley Act mandated his detention

52

once he was charged with assaulting a federal officer. 8 U.S.C. § 1226(c)(1)(E)(ii).

Regardless, it would have been *defendant's* burden to establish that the government detained him in ICE custody for an impermissible purpose. *See Ventura*, 96 F.4th at 501; *cf. United States v. Edmonds*, 103 F.3d 822, 825 (9th Cir. 1996) (defendant seeking to dismiss the indictment bears burden). He offered no such proof here (nor could he). Nor do the flimsy theories proffered by the district court fill the gap.

The court first pointed to the fact that the prosecution "coordinated with ERO to ensure defendant's transportation from ICE custody to criminal proceedings." (ER-27.) They are supposed to do that. Routine transport coordination does not evince government intent to subvert the BRA, or any other misconduct. It shows only that the prosecution made efforts to manage logistics across parallel civil and criminal tracks. The court's rebuke of inter-agency coordination was especially rich given that, six pages earlier, it chastised the prosecution for *failing* to coordinate with ICE to resolve the virtual scheduling

53

issues at the Adelanto facility. (*Compare* ER-19 *with* ER-27–28.) Both cannot be error.[14]

Additionally, the court speculated that—had immigration enforcement truly been the government's purpose—defendant would have been removed "within 48 hours." (ER-28 n.17.) Its sole support for this proposition was a self-cite to a 2020 opinion, *see United States v. Mejia Hernandez*, No. CR 18-0588 FMO, 2020 WL 1181495, at *2 (C.D. Cal. Feb. 20, 2020), which anyway has no bearing here. *Mejia Hernandez* was a § 1326 prosecution that involved reinstatement of a prior final removal order. *Id.* at *2. That is materially different from this case, where defendant was detained pursuant to an I-200 administrative arrest warrant, which—as the court recognized (ER-23)—is not a final order of removal, but rather a document reflecting ICE's preliminary intent to seek removal. *See id.* (citing *Yith v. Nielsen*, 881 F.3d 1155, 1167 n.6 (9th Cir. 2018); *Ochoa v. Campbell*, 266 F.

---

[14] Also, just because the prosecution was able to request transportation to court does not mean that it had any control over Adelanto's phone and virtual meeting scheduling system, which was operated by GEO Group, Inc., a private, third-party DHS contractor. (ER-9 n.5.)

Supp. 3d 1237, 1256 (E.D. Wash. 2017).)  Without a final removal order, the INA's 90-day removal period is not even triggered, much less a 48-hour period.  *See* 8 U.S.C. § 1231(a)(1)(A).  The district court's 48-hour removal benchmark was, in other words, a fiction.  And the inference that it drew against the government based on this fiction—that something other than legitimate removal interests must have explained the detention's duration—collapses with it.

The court also relied on *Zavala v. Ives*, 785 F.3d 367 (9th Cir. 2015), a sentencing case, for the proposition that when "ICE retains an alien in custody subsequent to an indictment . . . the intervening period of detention is presumed to be for the purpose of criminal prosecution." (ER-28 (quoting 785 F.3d at 378).)  Notably, however, the court omitted the last clause of the quoted sentence—"*and* the alien is entitled to sentencing credit," 785 F.3d at 378 (emphasis added)—which matters because, as the omitted language suggests, *Zavala* is a habeas case about sentencing-credit computation.  *Id.* at 378 ("We thus hold that the district court erred when it denied Zavala sentencing credit for the post-indictment period during which ICE detained him pending criminal prosecution.").  The presumption in *Zavala* operates in favor of a

55

defendant crediting his ICE detention against a later criminal sentence. It does not apply here. If it did, that would stretch a sentencing-credit rule far beyond what *Zavala* contemplated or needed to address.

In short, there was no basis in the record to support the district court's finding of pretext or purpose to violate the BRA. The district court's bases were either legally erroneous or factually nonsensical.

What the record does show is a district court that treated defendant's immigration detention as an affront to its own bail determination—and a judge who had made up his mind well before the parties ever stepped foot in his courtroom. The procedural history is revealing. At the very outset of the case, the district court issued a written order vacating the stay of the magistrate judge's release order, which had been issued pending the government's application for review. (ER-206–08.) In ordering defendant released forthwith, the court fired off a *preemptive threat* to dismiss the indictment if defendant were "taken into custody by ICE or any other federal law enforcement agency following his release." (ER-207–08.)

Then, at the first district court hearing in the case—convened to address an unrelated cash-deposit issue, with no dismissal motion

56

pending and no challenge to ICE custody before the court—the district court raised the issue of defendant's ICE detention, on its own initiative, right out of the gate. Following entry of the parties' appearances, the court announced—unprompted—that it would need to address "whether or not [defendant] should even be in ICE custody" and "whether or not [it] should dismiss the . . . charging document" because defendant was "in ICE custody." (ER-38.)

It then read aloud—again, wholly unprompted—a passage from a government brief it had pulled from an unrelated case at least a decade earlier ("*United States v. Banuelos*," no citation provided), which (apparently) characterized ICE detention as a violation of "ICE's statutorily prescribed mission" and of "the statutes governing ICE's operation." (ER-38–39.) Neither party had raised the issue, much less cited that case or brief. The court instructed the AUSA that what it had just read was "your position, the Government's position." (ER-39.) The court then immediately pivoted to the cash-deposit deadline (the purported basis for the hearing), without giving the only person in the courtroom who actually represented the government a chance to respond to its premeditated performance. (*Id.*)

57

Five days later, at a bail review hearing, the court was even more direct, beginning the hearing by reiterating its "view" that defendant "should now be released [from immigration custody]" and asking whether it was "the Government's position that he is going to remain in ICE custody through trial." (ER-61.) Then at the end of the hearing, after the court had ruled to uphold the magistrate judge's bail release decision, defense counsel mentioned in passing that he "ha[dn't] been successful at making an appointment" at Adelanto and the scheduling coordinator had not returned his voicemails. (ER-64.) In response, the district court proposed—sua sponte—that defense counsel "file an ex parte to dismiss the Indictment, because . . . defendant's continued immigration detention has jeopardized his constitutional and statutory rights to counsel." (ER-64.) The ex parte dismissal motion was filed the next day. (ER-115.)

None of this was the fair, impartial assessment of legal and factual questions that judicial review requires. To be sure, the district court's view may reflect a sincere (if wrong) conviction, but that does not excuse what the court did here: it proclaimed that defendant's (mandatory) immigration detention was unlawful before defendant was

even detained, and worked backward from that premise to drum up support of its position from defense counsel. That strayed far outside the court's proper judicial role. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020).

## C. Dismissal With Prejudice Was an Abuse of Discretion

A district court "may dismiss an indictment under its supervisory powers only when the defendant suffers substantial prejudice, and where no lesser remedial action is available." *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (cleaned up); *see United States v. Morrison*, 449 U.S. 361, 365 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.").

Dismissal of an indictment *with prejudice* is "the most severe sanction possible." *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("Such dismissal exercised under the guise of supervisory power is impermissible absent a clear basis in fact and law for doing so.") (cleaned up). "Because dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, this sanction may be

59

permitted only in cases of flagrant prosecutorial misconduct."
*Chapman,* 524 F.3d at 1085 (cleaned up); *see also Simpson*, 927 F.2d at 1091 (describing dismissal with prejudice as "substituting a judicial wag-of-the-finger for the prosecutorial nod"). The record in this case does not come close to clearing that high bar.

### 1. *The District Court Failed to Tailor the Remedy to the Constitutional Injury*

Even where a defendant's constitutional rights have been violated, the remedy for such must be carefully calibrated. As the Supreme Court has recognized, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Morrison*, 449 U.S. at 364.

The district court did not meaningfully attempt to tailor its remedy to the specific access-to-counsel deprivation, as *Morrison* requires. Instead it leapt straight to dismissal—a sanction it had threatened not only before any constitutional violation occurred, but

before defendant was even detained in ICE custody. (*See* ER-206–08.) That was an abuse of discretion.[15]

*Morrison* itself is instructive. There, the Supreme Court held that dismissal of an indictment was inappropriate, even where government agents had deliberately interfered with the attorney-client relationship by meeting with a criminal defendant without her lawyer present. 449 U.S. at 362–64. The Court reasoned that while the agents' behavior was "egregious," dismissal of the indictment was nevertheless a disproportionate remedy because the criminal proceeding could still "go forward with full recognition of the defendant's right to counsel and to a fair trial." *Id.* at 365. So too here. If dismissal was unwarranted in *Morrison*—where there was deliberate government intrusion into the attorney-client relationship—it could not possibly have been warranted in this case, where there was not even a deliberate violation but rather a series of bureaucratic scheduling difficulties and unanswered

---

[15] The government is not appealing the court's Sixth Amendment holding, accepting *arguendo* that a violation occurred, because even if there had been a violation, the remedy of dismissal—and certainly dismissal with prejudice—was grossly disproportionate and an abuse of the court's discretion.

voicemails, and where defense counsel did not even try to meet their client in person.

Moreover, any prejudice that arose from defense counsel's inability to schedule a virtual meeting with defendant in December 2025 was strictly tethered to the December 30, 2025 trial date.[16] The lesser, tailored remedy was obvious: continue the trial date. Indeed, there was not a single valid reason that the case had to be tried on such a compressed timeframe. December 30 was barely eight weeks after the charged crime *occurred*; at the time of dismissal, there had not been a single trial continuance and approximately one month remained on the speedy trial clock, which ran through January 30, 2026. Defendant had no statutory or constitutional right to trial before then. The district court was wrong to state that a continuance would have forced defendant to choose between his Sixth Amendment right to counsel and his speedy-trial rights. (ER-30.) Indeed, defense counsel did not even contact Adelanto to set up a virtual meeting until December 2—only

---

[16] The same is true for any prejudice that the court claimed was "exacerbated" by discovery delays. (ER-17.)

twenty-eight days before trial—suggesting that counsel (at least initially) believed that the amount of time remaining on the speedy-trial clock would have been adequate to prepare for trial. (ER-8; ER-125.) And, of course, defendant—like any other criminal defendant—could have agreed to a trial-date continuance if it turned out that more time was necessary. *Cf. Betterman,* 578 U.S. at 439 (speedy-trial right is personal to the defendant and may be waived). Nothing in the record—beyond the district court signaling its appetite to dismiss the case outright—suggests that defendant would have been unwilling to waive his speedy trial rights.[17]

In short, dismissal was wholly unnecessary. A brief trial continuance could have ameliorated any prejudice to defendant and still been within the 70-day speedy trial period. As in *Morrison,* the case could have "go[ne] forward with full recognition of defendant's right to counsel and to a fair trial." *Morrison*, 449 U.S. at 365–66. Given that lesser, tailored relief was available, dismissal of the indictment was

---

[17] In fact, in a status report filed while the dismissal motion was pending, defense counsel stated that "the defense currently anticipates that Mr. Parias will not be prepared to proceed to trial on December 30, 2025." (ER-194.)

"plainly inappropriate." *Id.* at 365; *see also United States v. Rogers*, 751 F.2d 1074, 1076–77 (9th Cir. 1985) ("Because it is a drastic step, dismissing an indictment is a disfavored remedy.").

## 2. Dismissal With Prejudice, Rather Than Without, Was Unjustified

The court compounded its abuse of discretion by granting the dismissal with prejudice rather than without. That remedy is "the most severe sanction possible." *Isgro*, 974 F.2d at 1097. Because it "necessarily implicates separation-of-powers principles," *id.,* and because it "encroaches on the prosecutor's charging authority . . .[s]uch an intrusion will be permitted only in cases of flagrant prosecutorial misconduct," *Simpson*, 927 F.2d at 1091; *Chapman*, 524 F.3d at 1085.

Once again, the record does not support the district court's decision. It justified its with-prejudice dismissal on two grounds, neither of which is valid. First, the court speculated that permitting re-prosecution would risk "repeating the same prejudice," *i.e.,* that defendant would be detained in ICE custody again in the future and encounter the same access-to-counsel issues. (ER-31.) But that presumes an unavoidable Sixth Amendment violation where the record reflected, at most, administrative dysfunction and delay due to a

64

temporarily overwhelmed system. The court had no basis to conclude with certainty that Adelanto would never fix the problems with its virtual scheduling system.

The court's second rationale was even less valid. It reasoned that dismissal with prejudice was warranted because allowing the government to "re-prosecute" the case would "unjustly allow[] the government a second opportunity to correct its prosecutorial shortcomings" and "probably allow [the government] to salvage what appears to be a 'poorly conducted prosecution.'" (ER-31 (citing *Chapman,* 524 F.3d at 1087).)

That, again, was outside the judicial role. The court was not in any position to judge the merits of the government's case. It did not even hear oral argument on defendant's dismissal motion, let alone conduct an evidentiary hearing. Yet it felt entitled to permanently bar a criminal case based on the characterization in defense counsel's briefs and declarations, and video footage of the charged conduct submitted by the defense (which had nothing to do with the Sixth Amendment access-to-counsel violation that was the purported basis for the motion). That was improper.

65

Moreover, *Chapman* instructs that a court may dismiss with prejudice to prevent the government from correcting prior misconduct only when those corrections would "advantage the government" by giving it a second opportunity it would not otherwise have. 524 F.3d at 1087. That was not the situation here: the government brought straightforward charges for a felony assault on federal officers with a car, and it offered to address the access concerns with a continuance. Under these circumstances, the use of dismissal with prejudice as punishment for prosecuting a case that the court deemed "poorly conducted" was an abuse of discretion.

### 3. *The Court's True Rationale—Protesting ICE's Practices—is an Illegitimate Basis for Exercising Supervisory Power*

The trajectory of this case—from the court's initial, forthwith-release order on November 21 to its dismissal order five weeks later—reveals that the district court's true aim in dismissing the indictment was not to ameliorate any actual prejudice suffered by defendant due to the access-to-counsel issues he encountered in December 2025. Rather, the court dismissed this case with prejudice in an effort to push back against ICE's detention of aliens charged with federal crimes, if not

66

against ICE itself.  (ER-30–32; *see also* ER-25 (asserting that "this Court is [not] powerless to prevent the Executive Branch from ignoring its obligations").)  Nevermind the Immigration and Nationality Act, and nevermind that detention in this case was mandatory under the Laken Riley Act.  The court's end game was clear from the start: it repeatedly threatened to dismiss the case at the outset (ER-207–08; ER-38), solicited a motion to dismiss at the earliest opportunity (ER-64–65), and reasoned that any remedy less than dismissal would not "address ICE's practice of denying criminal defense attorneys equivalent access to their clients in ICE custody as is provided to immigration attorneys" or "cure ICE's apparent inability or refusal to accommodate criminal defense counsel's requests for VTC or legal calls in a reasonably timely manner."  (ER-30.)

That was an abuse of discretion.  Dismissing a criminal case mere weeks after indictment to effectuate better administrative practices by a separate, civil Executive Branch agency (or its private third-party contractor, *see* ER-9 n.5) is an impermissible exercise of the court's supervisory powers.  *Cf. Simpson*, 927 F.2d at 1089, 1091 (district judge

67

may not "dismiss an indictment under the supervisory power because he disapproves of the government's investigatory tactics").

The supervisory power afforded to district courts is not a policy lever to be deployed as a means of rebuking a co-equal branch of government. Rather, as this Court has explained, it must be exercised judiciously: "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Id.* at 1090. The district court in this case exceeded its authority, wielding its supervisory powers as a sword rather than as a shield. That was wrong. The decision below should be reversed.

# VI

# CONCLUSION

This Court should reverse the district court's order dismissing the indictment with prejudice and remand with instructions to reinstate the indictment.

DATED: April 29, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER P. ROBBINS
AMY E. POMERANTZ
Assistant United States Attorneys
Criminal Appeals Section

*s/ Amy E. Pomerantz*

Attorneys for Plaintiff-Appellant
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government's appeals of with-prejudice dismissal orders based on civil immigration detention are also before this Court in *United States v. Arreola-Arreola*, C.A. 25-5471 (C.D. Cal.) (Olguin, J.), and *United States v. Zambrano*, C.A. 26-961 (C.D. Cal.) (Gee, C.J.), *see* Cir. R. 28-2.6(b), although in *Arreola-Arreola* the same district judge in this case attempted to retroactively convert his with-prejudice dismissal order into a without-prejudice dismissal almost four months after the government appealed. *Compare* Dkt. 39 *with* Dkt. 43, D.Ct. No. 25-MJ-4608 (C.D. Cal.); *cf. Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 822 n.3 (9th Cir. 2021).

Other government appeals have also raised the same issue— *United States v. Solano-Lopez*, C.A. 25-5469 (C.D. Cal.) (Vera, J.), and *United States v. Amezola-Arenas*, C.A. 25-6201 (C.D. Cal.) (Frimpong, J.)—but were voluntarily dismissed.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 12,876 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

DATED: April 29, 2026                    *s/ Amy E. Pomerantz*

AMY E. POMERANTZ
Attorney for Plaintiff-Appellant
UNITED STATES OF AMERICA