Appeal No. 25-8156

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

**v.**

CARLITOS RICARDO PARIAS,
*Defendant-Appellee*

---

Appeal from the United States District Court for the Central District of California, No. 2:25-cr-904-FMO
The Honorable Fernando M. Olguin

---

# APPELLEE'S ANSWERING BRIEF

---

AMY KARLIN
Interim Federal Public Defender
ALEXANDER BOTOMAN
Deputy Federal Public Defender
Alex_Botoman@fd.org
321 East 2nd Street
Los Angeles, CA 90012-4202
(213) 894-4784 | Fax: (213) 894-0081

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

ISSUES PRESENTED ........ 3

STATEMENT OF JURISDICTION ........ 3

STATEMENT OF THE CASE ........ 3

I. Factual Background ........ 3

A. Mr. Parias begins reporting on ICE's activities in Los Angeles ........ 3

B. Masked ICE agents swerve in front of Mr. Parias's car, shatter his windows, and shoot him without warning ........ 4

II. Procedural History ........ 6

A. The government charges Mr. Parias with "assault" on the theory that agents were hit by bits of rubber from his tires ........ 6

B. From the beginning of the case, the government disregards its discovery obligations ........ 7

C. Upon learning that Mr. Parias had been in custody for weeks under a "stayed" release order, the district court orders him immediately released ........ 8

D. The district court sets pretrial deadlines and warns that they are "firm" ........ 9

E. The government transfers Mr. Parias to the Adelanto ICE Detention Center, and the defense immediately raises concerns about their ability to meet with him ........ 10

TABLE OF CONTENTS (cont.)

Page

F. The district court again warns the government about the December 5 discovery deadline ..... 11

G. The government claims to be powerless to facilitate access to counsel at Adelanto ..... 12

H. After weeks of being unable to meet with Mr. Parias, the defense moves to dismiss the indictment ..... 16

I. The government's assurances about access to counsel at Adelanto immediately prove false ..... 18

J. Adelanto refuses to schedule any visits before Christmas Day—only five days before the December 30 Trial ..... 21

K. The government repeatedly violates the district court's pretrial deadlines ..... 22

III. The District Court's Order ..... 24

A. The court finds that the government violated Mr. Parias's Sixth Amendment rights by denying him access to his attorneys for nearly a month before trial ..... 25

B. The court finds that the Sixth Amendment violations prejudiced Mr. Parias ..... 26

C. The court makes clear that its Sixth Amendment findings are "independently" sufficient to resolve the motion ..... 28

D. The court finds that dismissal with prejudice is the only adequate remedy ..... 29

TABLE OF CONTENTS (cont.)

Page

SUMMARY OF THE ARGUMENT .................................................... 31

STANDARD OF REVIEW .............................................................. 35

ARGUMENT ................................................................................. 35

I. The district court did not abuse its discretion in dismissing the indictment after the government denied Mr. Parias access to his attorneys for nearly the full month before trial ..................................... 35

A. The government does not dispute that it violated Mr. Parias's Sixth Amendment rights ....................................................................... 37

B. The district court reasonably found that dismissal with prejudice was the only adequate remedy ..................................................... 41

1. A continuance would not have solved the ongoing Sixth Amendment violations ....................................................... 42

2. It was within the district court's discretion to dismiss the indictment with prejudice.................................................. 47

i. The government has waived any argument for dismissal *without* prejudice ................................................. 47

ii. At the very least, the district court did not plainly err by dismissing with prejudice ........................ 48

a. The district court's decision aligned with *Santos-Flores* and decisions of other judges in the district ....................... 49

TABLE OF CONTENTS (cont.)

Page

b. The district court reasonably found that dismissal without prejudice would give the government an unfair opportunity to salvage its faltering case ................ 52

c. The government's *ad hominem* attacks on the district judge are meritless ............ 54

II. The district court dismissed the indictment expressly—and only—to remedy Sixth Amendment violations ........................................................ 57

A. The district court's decision did not rest on a violation of the Bail Reform Act ................................ 58

1. The court repeated several times that it was not issuing a statutory holding .............. 58

2. The court's discussion of the BRA and INA merely illustrated that constitutional violations can occur when ICE and DOJ fail to coordinate their actions ...................................................... 60

3. There is no basis for attempting to look behind the district court's written order ................................................................ 63

B. The Court should not issue an advisory opinion on a statutory question the district court did not resolve.................................................. 66

C. Any error in the district court's statutory discussion was harmless............................................ 69

CONCLUSION ........................................................................... 71

TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Agarwal v. Arthur G. McKee & Co.*,
644 F.2d 803 (9th Cir. 1981) ........ 70

*Betschart v. Oregon*,
103 F.4th 607 (9th Cir. 2024) ........ 37

*Betterman v. Montana*,
578 U.S. 437 (2016) ........ 44

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 64

*Chafin v. Chafin*,
568 U.S. 165 (2013) ........ 66, 67

*Kansas v. Ventris*,
556 U.S. 586 (2009) ........ 37

*L.T. v. USCIS*,
No. 26-4902 (9th Cir. Aug. 20, 2026) ........ 39

*Maine v. Moulton*,
474 U.S. 159 (1985) ........ 37, 40

*Miller v. United States*,
78 U.S. 268 (1870) ........ 66

*Nordstrom v. Ryan*,
856 F.3d 1265 (9th Cir. 2017) ........ 37

*PDK Labs., Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) ........ 68

*Platt v. Moore*,
15 F.4th 895 (9th Cir. 2021) ........ 67

*Puckett v. United States*,
556 U.S. 129 (2009) ........ 49

TABLE OF AUTHORITIES (cont.)

Page(s)

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) ... 57

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ... 63

*United States v. Anekwu*,
695 F.3d 967 (9th Cir. 2012) ... 49

*United States v. Basmadjian*,
No. 2:23-cr-652-HDV (C.D. Cal. Mar. 16, 2026) ... 43, 50, 56

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) ... *passim*

*United States v. Cajbon-Gomez*,
2026 WL 1084837 (C.D. Cal. Apr. 16, 2026) ... 43, 50, 56

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008) ... *passim*

*United States v. Cruz*,
554 F.3d 840 (9th Cir. 2009) ... 47

*United States v. Engstrom*,
166 F.4th 835 (9th Cir. 2026) ... 35, 48, 65

*United States v. Gomez*,
165 F.4th 1199 (9th Cir. 2026) (en banc) ... 50

*United States v. Green*,
152 F.4th 1025 (9th Cir. 2025) ... 64

*United States v. Henthorn*,
931 F.2d 29 (9th Cir. 1991) ... 23

*United States v. Kama*,
394 F.3d 1236 (9th Cir. 2005) ... 48, 60

TABLE OF AUTHORITIES (cont.)

Page(s)

*United States v. Kimmel*,
741 F.2d 1123 (9th Cir. 1984) ........ 51

*United States v. Lucas*,
873 F.2d 1279 (9th Cir. 1989) ........ 46

*United States v. Mongol Nation*,
56 F.4th 1244 (9th Cir. 2023) ........ 69, 70

*United States v. Morrison*,
449 U.S. 361 (1981) ........ 27, 51

*United States v. Olano*,
507 U.S. 725 (1993) ........ 47

*United States v. Overton*,
573 F.3d 679 (9th Cir. 2009) ........ 25

*United States v. Plascencia-Orozco*,
852 F.3d 910 (9th Cir. 2017) ........ 54

*United States v. Rizk*,
660 F.3d 1125 (9th Cir. 2011) ........ 49

*United States v. Robertson*,
52 F.3d 789 (9th Cir. 1994) ........ 24

*United States v. Santos-Flores*,
794 F.3d 1088 (9th Cir. 2015) ........ 41, 49, 50, 61

*United States v. Soriano Nunez*,
928 F.3d 240 (3d Cir. 2019) ........ 28

*United States v. Stauffer*,
922 F.2d 508 (9th Cir. 1990) ........ 69

*United States v. Trujillo-Alvarez*,
900 F. Supp. 2d 1167 (D. Or. 2012) ........ 50, 66

TABLE OF AUTHORITIES (cont.)

Page(s)

*United States v. Ventura*,
96 F.4th 496 (2d Cir. 2024) .................................................... 62

*United States v. Wade*,
388 U.S. 218 (1967) .................................................... 37, 40

*United States v. Willoughby*,
742 F.3d 229 (6th Cir. 2014) .................................................... 49

*Washington v. Trump*,
858 F.3d 1168 (9th Cir. 2017) .................................................... 55

**Statutes & Constitutional Provisions**

18 U.S.C. § 3161(h)(1)(D) .................................................... 45

U.S. Const. amend. VI .................................................... 37

**Other Authorities**

Ximena Bustillo, *A California Man's Case Highlights Gaps in Care and Oversight at DHS Detention Centers*, NPR (June 20, 2026), https://perma.cc/6CPM-24ZC .................................... 6

# INTRODUCTION

The government's brief tells a story that cannot be reconciled with the district court's actual reasoning. The district court did not dismiss the indictment to "protest[] ICE's practices" or out of some personal pique. Nor did it base its ruling on a "conflict" between the Bail Reform Act and the Immigration and Nationality Act. Instead, the court dismissed the indictment expressly—and *only*—to remedy serious violations of Mr. Parias's Sixth Amendment rights. The government *has not appealed* these Sixth Amendment violations, and the district court was well within its discretion to conclude that they required dismissal with prejudice.

This case began when masked ICE agents in civilian clothes swerved in front of Mr. Parias's car as he was leaving for work, broke his windows without warning, and shot him in the arm for no apparent reason. They then turned around and charged *him* with assault.

But having initiated this prosecution, the government failed to do the minimum necessary to prosecute it. It violated nearly every pretrial deadline set by the district court. It waited until after the court's discovery cutoff to finally produce the video that made clear that the

shooting of Mr. Parias was unjustified. It transferred Mr. Parias to a remote ICE detention facility and then refused to schedule a single meeting with his attorneys for nearly the *entire month* before trial. And then—in a final attempt to stave off dismissal—it submitted a sworn declaration about Mr. Parias's ability to access counsel that was at best misleading, and at points, downright false.

The district court rightly put a stop to this. In a detailed fact-bound order, the court found that the denial of Mr. Parias's ability to consult with his attorneys during the month before trial violated his Sixth Amendment rights. And it further found that these violations—which were still ongoing—caused significant harm that warranted dismissing the indictment with prejudice.

The government has no answer for the Sixth Amendment violations—it expressly does not appeal them. Opening Br. 61 n.15. Instead, it asks this Court to issue a sweeping advisory opinion on a statutory question the district court did not resolve: whether it violates the Bail Reform Act (BRA) to place a released criminal defendant in immigration detention. But the district court never found a BRA violation—a point the government is eventually forced to concede. And

it was well within the court's discretion to find that the now-uncontested Sixth Amendment violations warranted dismissal with prejudice. The district court's judgment should be affirmed.

## ISSUES PRESENTED

1. Did the district court abuse its discretion by finding that dismissal of the indictment with prejudice was necessary to remedy the government's ongoing—and now undisputed—violations of Mr. Parias's Sixth Amendment rights?

2. Should the Court issue an advisory opinion on whether it violates the Bail Reform Act to place a released criminal defendant in immigration detention?

## STATEMENT OF JURISDICTION

Mr. Parias agrees with the government's statement of jurisdiction.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Mr. Parias Begins Reporting on ICE's Activities in Los Angeles

Carlitos "Richard" Parias is a respected independent journalist and longtime resident of Los Angeles. SER-64, SER-66. He has no

criminal record and had never previously been the subject of immigration enforcement proceedings. SER-66.

Mr. Parias became known for his TikTok videos under the handle "Richard LA," which covered life and culture in Los Angeles. SER-64. When ICE began conducting widespread raids across the city in 2025, Mr. Parias began documenting those, too. SER-64. His reporting earned him a Certificate of Recognition from a member of the Los Angeles City Council. SER-64. But it also attracted the attention of ICE.

### B. Masked ICE Agents Swerve in Front of Mr. Parias's Car, Shatter His Windows, and Shoot Him Without Warning

On the morning of October 21, 2025, Mr. Parias left his home to go to work. SER-60. He did not know that a group of federal agents was hidden on his street, waiting to arrest him on what they claimed was an ICE-issued "administrative warrant."[1] SER-60.

As Mr. Parias began driving down the street, an unmarked ICE vehicle abruptly swerved in front of him. Ex. A at 0:27–0:37.[2] Within

---

[1] The government has not produced the purported warrant.

[2] A motion to transmit Exhibit A to Mr. Parias's motion to dismiss, which consists of the body-worn camera footage of the agent who shot (Continued . . .)

seconds—and without saying a word to Mr. Parias—a masked ICE agent in civilian clothes jumped out and began breaking his car windows. Ex. A at 0:38–0:57. Mr. Parias looked visibly terrified. He repeatedly yelled "No tengo nada!"—"I don't have anything!"—suggesting he believed he was being robbed. Ex. A at 1:35–1:40. Mr. Parias pressed the accelerator to try to escape the seemingly dangerous situation. Ex. A 0:58–1:20. But his car was pinned in by other ICE vehicles and could not move. Ex. A 0:58–1:20.

Then, things got worse. The agent who had broken Mr. Parias's windows reached into the car and fired his gun without warning. Ex. A at 1:54–2:05. The bullet hit Mr. Parias in the elbow, and he began screaming in pain. Ex. A at 1:54–2:58. When the shot was fired, Mr. Parias was looking in the opposite direction of the agent. Ex. A at 1:54–1:57. The video makes clear that he did nothing warranting the use of deadly force.[3] Ex. A at 1:54–1:57.

---

Mr. Parias, is filed concurrently with this brief. The government's opposition to this routine procedural motion is meritless. The motion should be granted for the reasons stated therein.

[3] Mr. Parias apparently first came to ICE's attention in June 2025, when agents stopped a car he was riding in while documenting an ICE

(Continued . . .)

Mr. Parias was taken to the hospital, where he required surgery. SER-45. He remained hospitalized for nearly a week and still has not recovered from the gunshot wound. SER-45.[4]

## II. Procedural History

### A. The Government Charges Mr. Parias with "Assault" on the Theory That Agents Were Hit by Bits of Rubber from His Tires

While Mr. Parias was in the hospital, the government set about bringing criminal charges against him. It filed a complaint alleging that he had "assaulted" a federal officer, apparently on the theory that an agent had been hit by small pieces of rubber from his tires. ER-73–79. It later obtained an indictment that upgraded the charge to assault with a "deadly and dangerous weapon" (his car) and added a charge for depredation against property. ER-80–81.

---

operation in progress. Nearly everything about that incident was disputed below. But it was undisputed that Mr. Parias was wearing a "PRESS" vest, that the agents injured his leg at some point in the interaction, and that bystanders took him to the hospital for treatment. SER-65; SER-81–82. It was also undisputed that the government made no further efforts to arrest Mr. Parias until four months later, in the encounter giving rise to this case. SER-82.

[4] *See* Ximena Bustillo, *A California Man's Case Highlights Gaps in Care and Oversight at DHS Detention Centers*, NPR (June 20, 2026), https://perma.cc/6CPM-24ZC.

### B. From the Beginning of the Case, the Government Disregards Its Discovery Obligations

From the start of the case, the defense made clear that it intended to vigorously fight the charges. And from the start of the case, the government appeared unprepared to prosecute them.

The day after the initial appearance (October 28), the defense requested that the government produce the video of the October 21 stop, so that it could be used at the upcoming detention hearing. ER-13; SER-83. The government had included a screenshot from this video in its complaint. ER-77. But it refused to give the video to the defense—a decision the district court later called "inexplicabl[e]." ER-13; *see* SER-61. Indeed, despite repeated requests from the defense, the government would fail to produce *any* discovery until more than a month into the case. ER-13–14; SER-47.

Even without the video, the magistrate judge ordered Mr. Parias released on bond. SER-92–93. But instead of releasing Mr. Parias, the government went to the on-duty district judge, who temporarily stayed the release order until the government's appeal of it could be decided. ER-241.

### C. Upon Learning that Mr. Parias Had Been in Custody for Weeks Under a "Stayed" Release Order, the District Court Orders Him Immediately Released

The case was then assigned for all purposes to District Judge Fernando M. Olguin. But the government failed to inform Judge Olguin that its appeal of the release order remained pending—something it later admitted it should have done. SER-55. As a result, Mr. Parias remained in custody under the stayed release order for more than two weeks before the district court learned of the need for a ruling.[5] *See* SER-53–55.

Understandably concerned by this delay, the district court lifted the stay of the release order and ordered Mr. Parias released immediately. ER-206–07. Its order provided that if Mr. Parias was not released, or if he were "taken into custody by ICE or any other federal law enforcement agency," the government was required to explain his custody status and identify the agency detaining him. ER-207. It also

[5] Although the duty district judge had said at a hearing that he would defer to Judge Olguin on the appeal of the release order, the judge failed to file anything on the docket, leaving Judge Olguin unaware the appeal had not been decided. SER-54–55; *see* ER-207.

stated that if this occurred, the defense "may file an *ex parte* application to dismiss the operative charging document." ER-207–08.

The order did not say that the case *would* be dismissed, nor did it otherwise purport to prejudge any filing. ER-207–08. It merely granted permission to seek dismissal on a quicker-than-ordinary timeline.[6] ER-207–08.

### D. The District Court Sets Pretrial Deadlines and Warns That They Are "Firm"

Trial was set for December 30, 2025. SER-56. The district court issued an order that imposed several pretrial deadlines on the parties. ER-96–107. Relevant here, the court ordered the government to produce *all* discovery to the defense by December 5, 2026, including, specifically, all video recordings, exculpatory evidence, and all material information in the personnel files of law enforcement witnesses. ER-97–98, ER-106.

The district court cautioned that the discovery deadlines were "firm" and that it would not continue them without good cause. ER-99. And it expressly warned the government that failure to comply with

[6] In the Central District of California, the term "*ex parte* application" refers to any motion seeking relief more quickly than the ordinary month-long motion briefing schedule. *See* ER-65.

either its *Brady* obligations or the requirements of the court's order could result in "dismissal of the charges." ER-97; *see also* ER-99 ("If either party fails to comply with the discovery deadlines . . . the court will impose sanctions . . . .").

### E. The Government Transfers Mr. Parias to the Adelanto ICE Detention Center, and the Defense Immediately Raises Concerns About Their Ability to Meet with Him

On November 24, the government transferred Mr. Parias to the Adelanto ICE Detention Center in the desert of San Bernardino County, putting him several hours from his attorneys barely a month before the December 30 trial. SER-49–50.

The defense immediately raised concerns about the transfer. SER-44–48. They explained that they knew from experience that it would be "incredibly difficult" to represent Mr. Parias if he remained at Adelanto. SER-47–48. The facility presented "numerous barriers to having the privileged conversations that would be necessary to adequately prepare [his] defense." SER-48. Those barriers had already begun to manifest themselves. Upon learning of the transfer, the defense immediately

tried to arrange a video teleconference (VTC) call with Mr. Parias but were unable to do so.[7] SER-47.

### F. The District Court Again Warns the Government About the December 5 Discovery Deadline

On December 4, the district court held a hearing on the still-pending appeal of the magistrate judge's release order. *See* ER-34–46. The prosecutor assigned to the case did not attend, apparently because he had been sent away on a 10-day training less than a month before trial. ER-36; SER-8.

The district court expressed surprise that the government was appealing the release order, noting that the magistrate judge was "considered one of the more conservative magistrate judges on giving bail." ER-40. And it also expressed concern about Mr. Parias's transfer to ICE custody, observing that the transfer appeared inconsistent with the government's position in a previous case that detention by ICE during a criminal prosecution would "contravene the statutes governing ICE's operations." ER-38–39.

---

[7] The defense were unable to schedule the call because they did not have Mr. Parias's "A number"—a piece of information that was in the discovery the government had still not produced. SER-47.

Ultimately, however, the district court concluded that neither issue was properly before it because Mr. Parias had not yet perfected the bond package. ER-39–41. When the court asked the government for views on the issues it had raised, the prosecutor raised no objection to the court's statements or its consideration of whether it was proper for Mr. Parias to be in ICE custody. ER-41. Instead, she responded that she was just "standing in on this matter" and had nothing to add. ER-41–42.

The discussion then turned to the fast-approaching trial. The defense made clear that it wanted to keep the December 30 trial date, which the district court agreed to. ER-43–45. The court closed by noting that because the discovery deadline was the next day, "[t]he Government should have turned over all the discovery by now." ER-45–46. It then continued the hearing to the next week. *See* ER-46.

### G. The Government Claims to Be Powerless to Facilitate Access to Counsel at Adelanto

The continued hearing took place on December 9. ER-50–71. Again, the assigned prosecutor did not attend, this time replaced by a different substitute. ER-50–51.

The district court began by denying the appeal of the magistrate judge's release order.[8] ER-54–59. It then raised Mr. Parias's status in ICE detention: "what is going to happen after today?" ER-61. The court explained that it was "concerned" about the defense's "ability to meet with their client to prepare for trial," which, it noted, was "coming up soon." ER-61. It asked the government whether Mr. Parias would be released from ICE custody, noting that it would raise issues if he were not. ER-61.

The prosecutor had no answer for the court's concerns. While conceding that "Adelanto is far" and that "access is more difficult" than if Mr. Parias had remained detained in Los Angeles, she claimed that ICE was "a separate agency outside of our purview," and that "what they choose to do is not our decision." ER-61–62. The prosecutor's only suggestion was for the court to "reverse" its decision upholding the release order to enable Mr. Parias to be transferred back to Los Angeles. ER-62–63. But beyond that, the prosecutor claimed to be

[8] Although again expressing surprise that the government was appealing the release order, the district court twice invited the prosecutor to present arguments for overturning it, but the prosecutor declined to do so. ER-52, ER-54. The court then issued a detailed oral decision explaining its reasons for upholding the order. ER-54–59.

powerless to address the access-to-counsel issue: "[W]e litigate bond or detention, and then once that is settled, it's a little bit out of our purview." ER-63.

The district court rejected the government's suggestion to reverse its decision upholding the release order. ER-64–65. And it listened as Mr. Parias's attorneys detailed their ongoing inability to meet with him. ER-63–64.

The defense explained that Adelanto was a two-to-three-hour drive each way and visiting hours were limited. ER-63–64. They had tried to make an appointment to visit Mr. Parias, but the person who answered the phone at Adelanto told them that the appointment scheduler ("Ms. Camargo") "has not been returning calls or scheduling legal visits." ER-64. The only advice the Adelanto employee could offer was "to just keep leaving voicemails that hopefully will be responded to at some point." ER-64.

The district court recognized that the situation was untenable. With only three weeks until trial, the defense had been unable to schedule any meetings with Mr. Parias. ER-64. And the government

was offering no meaningful solutions, claiming to be powerless to intervene with Adelanto. ER-61–63.

The district court explained that it was "hoping the Government would tell me that, yes, they will get him released . . . and then you will be able to meet with him to prepare for trial." ER-66. But during the hearing, it became "pretty clear" that "that is not happening." ER-66. Accordingly, the district court offered to set a briefing schedule if the defense wanted to move for dismissal on the ground that Mr. Parias's detention in Adelanto had "jeopardized his constitutional and statutory rights to counsel" because he had "been denied the ability to meet with his attorney [and] prepare for the trial." ER-64.

The defense explained that they had been holding off on seeking dismissal while they made good-faith efforts to gain access to Mr. Parias at Adelanto. ER-65. But weeks of futile attempts in the month before trial had made clear that continued detention in Adelanto would make it impossible to prepare for trial. ER-65. They therefore informed the district court that they would move to dismiss the indictment. ER-66–67.

The district court made clear that it had not prejudged anything—"I don't know how it's all going to shake out until I read the briefing." ER-67. It instructed the parties that they should "assume we are going to trial" while also briefing the motion to dismiss. ER-67.

### H. After Weeks of Being Unable to Meet with Mr. Parias, the Defense Moves to Dismiss the Indictment

Mr. Parias's motion argued that the government had violated his Fifth and Sixth Amendment rights by detaining him in a remote facility while refusing to provide any access to his attorneys. ER-116. In support of the motion, the defense detailed their futile efforts to schedule a meeting with Mr. Parias at Adelanto. ER-124–27.

As noted, the defense had been told by Adelanto's own staff that the appointment scheduler ("Ms. Camargo") had been failing for weeks to return calls or schedule visits. ER-125. Ms. Camargo's voicemail instructed callers to leave only one message, because multiple messages "would further slow the response time." ER-125. But although the defense had left a message more than a week earlier, they had received no response. *See* ER-125.

The motion explained that it was not reasonable to expect the attorneys to block out four-hour driving windows during the month

before trial merely to see if Adelanto *might* let them visit without an appointment. ER-125. That was particularly true since Adelanto claimed to offer both phone and VTC appointments but was simply refusing to schedule one. *See* ER-125–26.

The motion also set forth the concrete prejudice the defense had suffered. Because the attorneys had been unable to meet with Mr. Parias, they had been unable to review *any* discovery with him. ER-125. Their inability to review video footage, reports, and other evidence with Mr. Parias had left them "at a standstill," unable to investigate the case or file any pretrial motions before the court's motion deadline. ER-121, ER-125–26.

In addition, the motion explained that it would not be feasible for Mr. Parias to be detained at Adelanto during the trial itself. ER-126–27. Because Adelanto was so far from the Los Angeles courthouse, Mr. Parias had to be woken up before 2 AM to make it in time for even afternoon hearings. ER-126–27. Lack of sleep, combined with the ongoing (and inadequately treated) pain from his gunshot wound, had noticeably interfered with his ability to focus during recent hearings. ER-126–27. Repeating this every day during trial would make it

impossible for Mr. Parias to remain alert, much less to meaningfully participate in his defense. ER-127.

### I. The Government's Assurances About Access to Counsel at Adelanto Immediately Prove False

In response, the government tried to paint a rosy picture of the defense's ability to access Mr. Parias at Adelanto. ER-133–46. It told the district court that Mr. Parias was "not precluded from seeing defense counsel" and could "do so either in person or virtually, seven days a week." ER-143. It said that attorneys could "contact their clients through video appointments." ER-139. And—relying on a sworn declaration from Jolene Velasquez (a "deportation officer" at Adelanto)—it claimed that "ICE ha[d] waived the one-hour visitation time limit that often applies." ER-139; *see* ER-145 (Velasquez Declaration) ("In this particular case and under these specific circumstances, ICE will waive the one-hour time limit.").

But the government's claims immediately fell apart. Mr. Parias's attorneys repeatedly attempted to follow the procedures set forth in the government's filing but were blocked from scheduling visits at every turn.

The same day that they received the government's brief (December 12), the defense attempted to schedule a VTC visit. ER-174. But although the government's filing was plainly intended to convey that all obstacles to visiting Mr. Parias had been removed, the person who answered the phone at Adelanto ("Officer Torres") said that Mr. Parias's attorneys would need "ICE's permission" before they could schedule a visit—permission the prosecutor had apparently not already secured. ER-174. The defense followed Officer Torres's instructions for requesting permission but received no response. ER-174.

Three days later (on December 15), the defense tried again. ER-174. Officer Torres again answered the phone and again repeated that she could not schedule a visit because ICE had not granted permission to Mr. Parias's defense counsel. ER-174. She also said that the attorneys had to use an online system to request permission—a change from her previous instructions. ER-174. When told that her statements conflicted with the Velasquez Declaration and the written policy attached to it, she responded "I don't know who Velasquez is, and I have been instructed that if someone discloses that they are criminal

attorneys representing a detainee they must have permission from ICE allowing [them] to schedule telephonic or other visits." ER-174–75.

At a loss for how to proceed, the defense contacted the government's declarant, Officer Velasquez. ER-175. Officer Velasquez echoed Officer Torres's claim that ICE needed to "approve" visits by Mr. Parias's attorneys—a requirement she did not mention in her declaration. ER-175. And she added other information that conflicted with her sworn statement to the district court.

For example, although her own declaration said unequivocally that ICE had waived the one-hour time limit that normally applies to legal visits, ER-145, Officer Velasquez claimed to know nothing about any waiver. ER-176. She said that she "was unaware of any specific or special accommodations made for Mr. Parias's case" and that the one-hour time limit remained in place. ER-176. At most, she said, ICE *might* extend the time limit if a specific request were made. ER-176.

There were also other discrepancies. Officer Velasquez's declaration claimed that Adelanto would allow Mr. Parias's attorneys to visit him "every day between the hours of 8 AM and 8 PM." ER-145. But when asked about this, Officer Velasquez admitted that the 8 AM to 8

PM window was "not exactly accurate." ER-177. Visits could not be scheduled during and leading up to "counts" that occurred between 10:30 AM and 11:30 AM, around 3 PM, and at other times throughout the day that Officer Velasquez could not remember. ER-177.

### J. Adelanto Refuses to Schedule Any Visits Before Christmas Day—Only Five Days Before the December 30 Trial

Officer Velasquez did, however, purport to orally grant the defense permission to schedule visits with Mr. Parias. ER-175. But when the defense immediately attempted to schedule a visit, the soonest Adelanto offered was 10 days later on Christmas morning (December 25), which, beyond being a holiday, was well after the pretrial conference and only five days before the December 30 trial. ER-175; SER-25–26; SER-31–32.

Nor was that limited availability an anomaly. Except for Christmas Day and one slot the next day (December 26), Adelanto's system showed no availability *at all* for either phone or VTC visits for the entire months of January, February, March, April, or May 2026. ER-176; *see also* SER-34–43.

The defense asked Officer Velasquez if anything could be done to expedite a call, given the looming December 30 trial date. ER-176. But

Officer Velasquez claimed not to know how calls could be expedited or to whom a request could be made. ER-176. And the next day, Adelanto informed the defense that expedition was unlikely, telling them that "there is a high possibility that [the requested] visit will not be scheduled in time." ER-188.

Adelanto's refusal to schedule visits with Mr. Parias continued through the eve of trial. On December 24—six days before trial was to start—the defense informed the district court that there had been "no meaningful change" to their ability to access Mr. Parias. ER-192.

### K. The Government Repeatedly Violates the District Court's Pretrial Deadlines

While the government was refusing to schedule meetings between Mr. Parias and his counsel, it was also violating nearly every pretrial deadline. The court had set a firm December 5 cutoff for the production of *all* discovery, ER-99, ER-106, but the government continued to produce critical evidence well after that date, with no valid excuse for its late productions.

As one example, in every criminal case, the government must search for information in the personnel files of its law enforcement witnesses and produce anything that is material and favorable to the

defense (*Henthorn* material).[9] But the court's December 5 deadline for producing *Henthorn* material came and went without the government producing anything. SER-13–14. It did not move for an extension of the deadline or make even a partial production. *See* SER-13–14. It simply did nothing. SER-13–14.

It was not until 10 days later—when the government belatedly sought an extension of the long-expired deadline—that the full extent of the government's failures emerged. Not only had the government not produced any *Henthorn* material by the December 5 deadline, it had not even begun *searching* for much of that information until days after the deadline by which the information was supposed to have already been *provided*. *See* SER-7 (admitting that the government did not start sending "*Henthorn* letters" to the relevant agencies until December 10).

Similar failures abounded. The government waited until after the December 5 discovery cutoff to produce the video that made clear that the shooting of Mr. Parias was unjustified—a video its own officer had filmed nearly two months earlier. ER-192–93; Ex. A. And the government also ignored other court deadlines. Among other things, it

[9] *See United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).

disregarded the district court's cutoffs for filing jury instructions, its trial memorandum, and a declaration addressing its compliance with its discovery obligations. ER-193. These cascading failures—combined with the defense's inability to communicate with Mr. Parias—made it impossible to proceed with the trial.[10] ER-193.

## III. <u>The District Court's Order</u>

After considering the evidence before it, the district court issued a detailed 28-page order dismissing the indictment. ER-5–32. The court found that the government had violated Mr. Parias's Sixth Amendment rights by "effectively deny[ing] him access to his counsel for nearly the entire month preceding trial." ER-16; *see* ER-19. And it found that the government had presented no viable alternative to dismissal with prejudice, particularly since the constitutional violations were ongoing, with no signs of abating. ER-29–31.

---

[10] For the first time on appeal, the government complains about the district court's pretrial deadlines. Opening Br. 20–21 & n.8. But the government raised no objection in the district court—to the contrary, it claimed to be taking the deadlines "very seriously" even as it repeatedly violated them. SER-19. Nor did the government move to extend any of the deadlines before they expired. Any objection to the deadlines has long since been waived. *See United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994).

### A. The Court Finds That the Government Violated Mr. Parias's Sixth Amendment Rights by Denying Him Access to His Attorneys for Nearly a Month Before Trial

The district court began by summarizing the evidence of the defense's inability to meet with Mr. Parias at Adelanto. ER-7–13. Although acknowledging the government's claim that it was theoretically possible to schedule legal visits at Adelanto, the district court credited the defense team's actual experience over Adelanto's written policies.[11] ER-16–19.

The district court found that the government had made it impossible for the defense to communicate with Mr. Parias by telephone or VTC. ER-16 ("Mr. Parias is not 'free' to communicate with his attorneys by telephone."); *id.* (crediting evidence that Adelanto refused to schedule a call before Christmas Day); *see also* ER-18. And the court

[11] The government's brief continues to rely on Adelanto's written policies while ignoring the district court's findings that they were unavailable in practice. *Compare* Opening Br. 10–11, *with* ER-16–19. Surprisingly, the government even continues to claim that the one-hour time limit for visits had been waived in Mr. Parias's case—a claim its own declarant immediately recanted. *Compare* Opening Br. 11, *with* ER-176. Because the government has not challenged the district court's findings as clearly erroneous, this Court must therefore accept the facts as the court found them. *United States v. Overton*, 573 F.3d 679, 688 (9th Cir. 2009).

also found that the theoretical possibility of trying to visit Mr. Parias in person would have been inadequate. ER-16. Beyond the fact that the driving time could "easily exceed three hours each way," the court found that "ICE did not even grant defense counsel permission to visit Mr. Parias in Adelanto until December 15, 2025" meaning that any attempt to visit him before then "would have been futile." ER-16–17.

Based on this evidence, the district court found that the "obstacles and roadblocks that ICE has put in place at Adelanto ma[de] it difficult, if not impossible, for [Mr. Parias] to meet with his attorneys." ER-17. And it found that the prosecution was equally to blame: "the U.S. Attorney's Office did not coordinate with ICE to resolve the access to counsel issue," resulting in Mr. Parias being "denied the assistance of counsel for most of the month immediately preceding his trial's start date." ER-19. Given these findings, the court concluded that the government had violated Mr. Parias's Sixth Amendment rights. *See* ER-19.

### B. The Court Finds That the Sixth Amendment Violations Prejudiced Mr. Parias

The district court also found substantial prejudice to Mr. Parias. ER-19. The government had denied him the ability to meet with his

attorneys for nearly the entire month before trial—a situation that was inherently prejudicial. ER-16–17. And the court found that the prejudice was "exacerbated" by the government's failure to comply with the court's deadlines and timely produce discovery. ER-17.

The court explained that the government had "inexplicably" waited nearly a month after the first discovery request to produce *any* discovery. ER-13; *see* ER-17. And it was not until after the December 5 discovery deadline that it finally produced the video taken by the officer who shot Mr. Parias. ER-17. By waiting to produce anything until after Mr. Parias had been transferred to Adelanto (where he had no access to his attorneys), "the government eliminated any possibility for the defense to review the footage with Mr. Parias." ER-17. The court found that the inability to review discovery with Mr. Parias and resulting inability to investigate and file motions had or threatened an "'adverse effect upon the effectiveness of counsel's representation[,]' so as to constitute prejudice." ER-19 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)).

### C. The Court Makes Clear That Its Sixth Amendment Findings Are "Independently" Sufficient to Resolve the Motion

The district court made clear that its "findings and conclusions concerning the Sixth Amendment violation" were "sufficient to independently resolve" Mr. Parias's motion to dismiss. ER-19. But it explained that it would go on to "address the arguments raised by the parties regarding the interaction of the Immigration and Nationality Act . . . and the Bail Reform Act." ER-19.

The district court repeated several times, however, that this statutory question was not the basis for its decision to dismiss the indictment. Indeed, it directly addressed the government's statutory cases and explained why they did not govern the *constitutional* issue—the only issue the court had ruled on:

> The court . . . rejects as inapposite the government's reliance on non-binding out-of-circuit cases like *United States v. Soriano Nunez*, 928 F.3d 240 (3d Cir. 2019) [and five other cases]. Those cases merely stand for the general proposition that the BRA does not preclude the government from exercising its independent detention authority under the INA, *but say nothing about a district court's ability to craft appropriate remedies for constitutional violations* occasioned by the administrative detention of a criminal defendant.

ER-26 (emphasis added and internal citation omitted).

The court then reiterated that point: the government's reliance on statutory-interpretation cases "'misunderst[ood] the defense's argument' and this court's reasoning." ER-26. That is because the question here was not whether ICE had statutory authority to detain Mr. Parias, but "whether [his] remote immigration detention, *whether legally justified or not*, is functionally depriving him of access to counsel and interfering with his right to prepare his defense for trial." ER-26 (emphasis added). As the government now concedes, the district court ultimately found no violation of the Bail Reform Act. *See* Opening Br. 30 n.11.

### D. The Court Finds That Dismissal with Prejudice is the Only Adequate Remedy

Having concluded that the government violated Mr. Parias's constitutional (but not statutory) rights, the district court turned to the appropriate remedy. It recognized that any remedy had to be "tailored to the injury suffered from the constitutional violation," ER-29, and it "t[ook] seriously" that "'dismissal of the indictment [i]s the most severe sanction,'" ER-31 (quoting *United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008)). But it concluded that none of the government's

alternatives to dismissal would cure the ongoing prejudice to Mr. Parias. ER-29–32.

Relevant here, the district court rejected the government's suggestion to continue the trial.[12] ER-30. It found that a continuance would improperly require Mr. Parias to choose between his right to consult with counsel and his separate right to a speedy trial. ER-30. And it further found that merely delaying the trial would be pointless because the government's "demonstrated inability" to provide Mr. Parias with access to his attorneys made it likely that "the present course of events would simply repeat themselves." ER-31

The government had not argued that any dismissal should be without prejudice, but the district court addressed that question nonetheless. ER-31–32. It concluded that dismissal without prejudice would be insufficient because it "risk[ed] repeating the same prejudice against Mr. Parias" and would "unjustly allow[] the government a second opportunity to correct its prosecutorial shortcomings." ER-31.

---

[12] The district court also rejected the government's suggestions that the court could "reverse" its release order and that it would be sufficient for the government to transport Mr. Parias to the trial itself. ER-29–30. The government does not challenge those findings.

Permitting the government to bring a new case—"with timely production of discovery, compliance with the court's deadlines, and adherence to its disclosure obligations"—would prejudice Mr. Parias by giving the government another chance "'to salvage what' appears to be 'a poorly conducted prosecution.'" ER-31 (quoting *Chapman*, 524 F.3d at 1087)). Accordingly, the court found that "no lesser remedial action [was] available" than dismissing the indictment with prejudice. ER-31.

## SUMMARY OF THE ARGUMENT

This appeal comes to the Court in a strange posture. The government has not appealed the Sixth Amendment violations that were the basis for the district court's dismissal order. Opening Br. 61 n.15. Instead, it asks the Court to hold, as a matter of statutory interpretation, that the Bail Reform Act does not prohibit placing a criminal defendant in immigration detention after he has been granted release in his criminal case. But as the government concedes, the district court found no BRA violation. Opening Br. 30 n.11. The district court's decision to dismiss the indictment instead rested solely on the government's violations of Mr. Parias's Sixth Amendment rights.

The Court should not issue an advisory opinion on a statutory question the district court never resolved. Instead, it should simply affirm based on the now-undisputed Sixth Amendment violations.

I. The government does not dispute that it violated Mr. Parias's Sixth Amendment rights. Although it tries to minimize the extent of its failures, the record shows otherwise. The government refused to schedule any meetings between Mr. Parias and his attorneys for nearly the full month leading up to the trial. It violated almost every pretrial deadline set by the district court. And it provided the district court with assurances about the defense's ability to meet with Mr. Parias that were at best misleading, and at points, downright false.

These Sixth Amendment violations resulted in concrete and obvious prejudice to Mr. Parias. Because the government failed to produce any discovery until after Mr. Parias's transfer to Adelanto, his attorneys could not review any of the evidence with him. That left the defense at a standstill, unable to file pretrial motions, conduct necessary investigation, or otherwise prepare for trial. And because the denial of access to counsel was still *ongoing*, it was unclear when, if ever, the trial could proceed.

On these facts, it was well within the district court's discretion to dismiss the indictment with prejudice. The only alternative the government offered below was a 30-day continuance, but that would not have solved the problem. As the district court found, nothing in the record suggested that ICE would suddenly begin permitting Mr. Parias to meet with his attorneys—to the contrary, Adelanto's system showed no availability for meetings in all of January, February, March, April, and May 2026. The district court reasonably found that a short continuance would likely result only in further Sixth Amendment violations.

For the first time on appeal, the government argues that the court should have dismissed the indictment *without* prejudice. The argument is waived. But even if not, it was not an abuse of discretion—much less plainly erroneous—for the district court to reject it. Beyond the fact that the Sixth Amendment violations showed no sign of abating, the district court correctly found that permitting a re-prosecution would give the government an unfair opportunity to salvage its faltering case. That finding was firmly grounded in both the record and this Court's precedent. It provides no basis for reversal. *See United States v. Bundy*,

968 F.3d 1019, 1043 (9th Cir. 2020); *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008).

II. The Court should reject the government's request for an advisory opinion on a statutory question not at issue here: whether it violates the Bail Reform Act to place a released criminal defendant in immigration detention. The district court went out of its way to make clear that it was not deciding the case on statutory grounds. Indeed, even the government concedes that the court found no BRA violation. Instead, the court concluded that dismissal was required expressly—and *only*—to cure ongoing violations of Mr. Parias's Sixth Amendment rights. Nothing the Court could say about the BRA would affect that holding.

For similar reasons, any error in the district court's discussion of the BRA was harmless. Even if the court's order could be read as reflecting misconceptions about the statute, and even if this tangential discussion could somehow be transformed into an independent holding, the result would be no different. The court made clear that the Sixth Amendment violations alone required dismissal. ER-19 ("[T]he court's findings and conclusions concerning the Sixth Amendment are

sufficient to independently resolve defendant's Application."). Because the court's Sixth Amendment holding independently supports its judgment, this Court should affirm.

## STANDARD OF REVIEW

The district court's dismissal of the indictment is reviewed for abuse of discretion. *Bundy*, 968 F.3d at 1030 (citing *Chapman*, 524 F.3d at 1086). The court's factual findings are reviewed for clear error. *Id.*

Issues the government failed to raise in the district court are reviewed, at most, for plain error. *United States v. Engstrom*, 166 F.4th 835, 842 (9th Cir. 2026).

## ARGUMENT

### I. The District Court Did Not Abuse its Discretion in Dismissing the Indictment After the Government Denied Mr. Parias Access to His Attorneys for a Month Before Trial

A district court may dismiss an indictment under its supervisory powers "(1) to implement a remedy for the violation of a recognized . . . constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *Bundy*, 968 F.3d at 1030. Dismissal is warranted when the government "reckless[ly] disregards" its

constitutional obligations, resulting in substantial prejudice to the defendant. *Chapman*, 524 F.3d at 1085, 1087.

This Court's review of the district court's decision is "limited and deferential." *Bundy*, 968 F.3d at 1043. On appeal, the question is only whether dismissal with prejudice "was within the range of appropriate remedies" the court could have selected. *Id.* at 1045; *id.* at 1043 ("We do not have to find that dismissal with prejudice is the only remedy the court could have chosen").

The government does not dispute that it violated Mr. Parias's Sixth Amendment rights by denying him access to his attorneys for nearly the entire month leading up to trial. ER-16–19; *see* Opening Br. 61 n.15 ("The government is not appealing the court's Sixth Amendment holding, accepting *arguendo* that a violation occurred . . . ."). These persistent—and ongoing—Sixth Amendment violations made it impossible for the trial to proceed, causing substantial prejudice to Mr. Parias. On these facts, it was well within the district court's discretion to dismiss the indictment with prejudice.

### A. The Government Does Not Dispute that It Violated Mr. Parias's Sixth Amendment Rights

The Sixth Amendment guarantees to criminal defendants the right "to have the Assistance of Counsel for [their] defense." U.S. Const. amend. VI. The "core of this right" is the ability "to consult with an attorney and to have him investigate the case and prepare a defense for trial." *Kansas v. Ventris*, 556 U.S. 586, 590 (2009). A defendant's "ability to communicate candidly and confidentially with defense counsel" is therefore not only "essential" to his defense—it is "nearly sacrosanct." *Nordstrom v. Ryan*, 856 F.3d 1265, 1271 (9th Cir. 2017) (cleaned up).

The right to confidential communication with counsel is especially important in the period leading up to trial. *See Betschart v. Oregon*, 103 F.4th 607, 619–22 (9th Cir. 2024). The time between arraignment and trial is "perhaps the most critical period of the proceedings." *United States v. Wade*, 388 U.S. 218, 225 (1967). As the Supreme Court has recognized, to deprive a defendant of the ability to consult with counsel during that period "may be more damaging than [doing so] during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985).

The district court found that the government violated Mr. Parias's Sixth Amendment rights by transferring him to a remote facility located

hours away from his attorneys and then "effectively den[ying] him access to his counsel for nearly the entire month preceding trial." ER-16. The government does not dispute that finding—indeed, it has expressly declined to challenge it. Opening Br. 61 n.15. And while the government now tries to minimize the extent of its failures, the record shows otherwise. During the most critical period of the case, the government refused to schedule *any* meetings between Mr. Parias and his attorneys while simultaneously providing false assurances to the district court.

The government told the district court that Mr. Parias was "not precluded from seeing defense counsel," ER-143, while omitting that ICE had not even *granted permission* for his attorneys to visit him and would not do so until weeks after his transfer, ER-16. It assured the district court that the one-hour limit for visits had been "waive[d]," ER-145, only for its own declarant to immediately recant that statement and claim to be unfamiliar with how it ended up in her sworn declaration, ER-176. It asserted that Mr. Parias could meet virtually with his attorneys "seven days a week," ER-143, while leaving out that the earliest possible meeting was on Christmas Day, just five days

before trial, ER-16. And it provided the defense with an ever-changing series of instructions for scheduling visits at Adelanto, all of which proved futile.

The situation was Kafkaesque. At the same time the government was assuring the court that Mr. Parias was "not precluded" from meeting with his attorneys "in person or virtually," "seven days a week," ER-143, it was rejecting *every* attempt by the defense to schedule a visit over the course of nearly a month. The district court unsurprisingly found that the ongoing denial of access to counsel violated Mr. Parias's Sixth Amendment rights.[13] ER-15–19.

---

[13] The government cannot avoid responsibility by blaming the company it hired to operate Adelanto. *See* Opening Br. 54 n.14. Indeed, this Court recently rejected exactly this argument for Adelanto specifically. *L.T. v. USCIS*, No. 26-4902, Dkt. 22 at 2 (9th Cir. Aug. 20, 2026) (order denying stay) ("Even if the Government does not run [Adelanto] day-to-day, it is ultimately responsible for ensuring that the conditions of confinement are constitutionally acceptable."). It was the government's obligation to ensure that Mr. Parias had access to his attorneys. And it was the government that instead detained Mr. Parias in Adelanto and kept him there even after the access problems became obvious. *See id.* at 3 (noting that the government can "choose to release or move [detainees] as needed to avoid constitutional violations"). Responsibility for the constitutional violations rests with the government alone. *See Bundy*, 968 F.3d at 1037 (rejecting "[t]he government's attempts to absolve itself of wrongdoing for other agencies' failures").

And the district court also correctly found that the violations caused substantial prejudice to Mr. Parias. ER-16–19. Prejudice is obvious when the government completely denies a defendant access to his attorneys for nearly the entire month leading up to trial. *See Moulton*, 474 U.S. at 170; *Wade*, 388 U.S. at 225. But the district court also found case-specific prejudice to Mr. Parias that was "exacerbated" by the government's repeated discovery failures. ER-17.

The government did not produce any discovery until more than a month into the case—after it had transferred Mr. Parias to Adelanto. ER-17. And it continued to belatedly produce critical discovery (including the video from the officer who shot Mr. Parias) well after the court's discovery deadline. ER-17. By waiting until Mr. Parias was in Adelanto to produce the videos (or anything else), the court correctly found that the government "eliminated any possibility for the defense to review the footage with Mr. Parias."[14] ER-17. This left the defense

---

[14] The government attempts to challenge this finding, claiming that the video was produced on December 10, "six days before the December 16 VTC meeting defense counsel had proposed." Opening Br. 21. But although the defense had *proposed* a December 16 VTC meeting, Adelanto *refused to schedule* that meeting—or any meetings before Christmas Day, five days before the trial date. ER-176. The (Continued . . .)

unable to investigate the case, unable to file motions on Mr. Parias's behalf, and ultimately, unable to prepare to defend him at the December 30 trial. ER-19. The prejudice was concrete and clear.

### B. The District Court Reasonably Found That Dismissal with Prejudice Was the Only Adequate Remedy

When placing a defendant in immigration detention "jeopardizes the district court's ability to try him, . . . the district court may craft an appropriate remedy." *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015).

The district court found that the Sixth Amendment violations had prevented the December 30 trial from proceeding. ER-26. It took seriously that any remedy had to be "tailored" to the violation and that dismissal with prejudice was "the most severe" sanction. ER-29, ER-31. And it carefully considered the alternative remedies proposed by the government. ER-29–32. But it ultimately concluded that nothing short of dismissal with prejudice would cure the harm caused by the ongoing

---

district court therefore correctly found that the late production made it impossible to review the video with Mr. Parias in time to prepare for trial. ER-17.

violations of Mr. Parias's Sixth Amendment rights. ER-31. That finding was neither an abuse of discretion nor plainly erroneous.

#### 1. A Continuance Would Not Have Solved the Ongoing Sixth Amendment Violations

The government argues that the district court should have continued the trial instead. But its claim that a brief 30-day continuance (to January 30) would have "ameliorated any prejudice," Opening Br. 63, cannot be reconciled with the district court's factual findings or the evidence presented below. As the district court explained, "nothing in the record" suggested that the government would suddenly begin granting Mr. Parias access to his counsel if the trial were continued. ER-31. To the contrary, the court found that the government's "demonstrated inability" to provide access to date had made it likely that "the present course of events would simply repeat themselves." ER-31.

The district court's findings were amply supported by the record. Mr. Parias's inability to access counsel was still ongoing on December 24—only six days before trial. ER-192. And Adelanto's scheduling system showed no availability for visits for the entire *months* of January, February, March, April, or May 2026. ER-176; SER-34–42.

Against this evidence, the government cites nothing—not one page of the record—to back up its claim that the access-to-counsel issues were only temporary. And indeed, it is now clear that the issues were *not* temporary. Other judges of the Central District of California went on to find nearly identical Sixth Amendment violations at Adelanto well after the government's contemplated January 30 trial date.[15]

In addition, the district court correctly found that a continuance would improperly require Mr. Parias to choose between his right to a speedy trial and his right to consult with counsel to prepare a defense. ER-30. That concern was particularly acute, because Mr. Parias had made clear that he wanted to go to trial at the earliest opportunity. ER-43–44. The district court reasonably concluded that he should not have to sacrifice his right to a speedy trial to vindicate his right to counsel—

[15] *See United States v. Cajbon-Gomez*, 2026 WL 1084837, at *2–5 (C.D. Cal. Apr. 16, 2026) (dismissing with prejudice when Adelanto staff refused to schedule any calls or visits with the defendant and his counsel between November 2025 and January 2026, and a staff member stood next to the defendant during a call in February 2026, making it impossible to have a confidential conversation); *United States v. Basmadjian*, No. 2:23-cr-652-HDV, ECF 84 at 10, 15 (C.D. Cal. Mar. 16, 2026) (dismissing with prejudice in part because "defense counsel was able to schedule only *two* meetings with [the defendant] at Adelanto in the *five months* that he was detained there").

particularly when the government's own misconduct was the only reason he could not exercise both.[16] ER-30.

With no answer for that reasoning, the government takes aim at the entire concept of speedy trial rights. It complains that "there had not been a single trial continuance" and incorrectly asserts that the trial date was "barely eight weeks" after the charged assault (in reality, the December 30 trial date was a full *ten* weeks after the October 21 incident). Opening Br. 62. But the government has no entitlement to a continuance in a criminal case, much less one required by its own misconduct. *See Betterman v. Montana*, 578 U.S. 437, 443 (2016) (speedy trial rights ensure that a defendant will not have to "languish under an unresolved charge").

The government's assertion that the Speedy Trial Act clock would have permitted a continuance until January 30 only underscores the

---

[16] The government's speculation that Mr. Parias might have been willing to waive his speedy trial rights, Opening Br. 63, ignores his attorney's statement that he wanted to go to trial on December 30, ER-44. Instead, the government cites a status report out of context, Opening Br. 63 n.17, while omitting that the report was filed only six days before trial and expressly identified "the government's interference with Mr. Parias's ability to adequately and timely prepare for trial" as the reason the defense could not proceed on December 30. ER-192–94.

district court's point. *See* Opening Br. 62. A January 30 trial date became theoretically available only because the government's refusal to permit Mr. Parias access to his counsel eventually forced the defense to file a motion to protect his Sixth Amendment rights—a motion that came with the side effect of pausing the Speedy Trial Act clock. *See* Opening Br. 23 n.10; 18 U.S.C. § 3161(h)(1)(D). Had the government adhered to its constitutional obligations from the start, the clock would never have stopped and the Speedy Trial Act would have required the trial to occur weeks earlier. The district court reasonably concluded that the government should not be able to wield its own wrongdoing to force Mr. Parias into a later trial date than was otherwise his right. ER-30.

The government also invokes this Court's decision in *Lucas* to suggest that the attorneys should have driven several hours to Adelanto in the hope that they *might* be permitted to visit Mr. Parias. *See* Opening Br. 19–20, 27, 62. But the government has not disputed that its persistent refusal to *schedule* visits violated Mr. Parias's Sixth Amendment rights. Opening Br. 61 n.15. Having conceded the constitutional violations, the government must also accept that *Lucas*

(which found no violations) is irrelevant to this case. *See United States v. Lucas*, 873 F.2d 1279, 1279–81 (9th Cir. 1989).[17]

And in any event, the district court sensibly declined to require the defense to pursue every dead end in the government's wild-goose chase. As the court found, it would have been "futile" for the defense to have driven to Adelanto until at least December 15—barely two weeks before trial—because ICE had not granted permission for his attorneys to visit. ER-16–17. And even after that point, Adelanto still refused to schedule appointments. ER-175–76. Nothing suggested that showing up unannounced at Adelanto would have succeeded when every other avenue offered by the government had failed.

[17] *Lucas* is also inapposite for the reasons given by the district court, including that the defendant in *Lucas* was "free to communicate by telephone" with his attorneys, while Mr. Parias was not. *Lucas*, 873 F.2d at 1280; ER-16.

### 2. It Was Within the District Court's Discretion to Dismiss the Indictment with Prejudice

#### *i. The Government Has Waived Any Argument for Dismissal* Without *Prejudice*

For the first time on appeal, the government argues that the district court should have dismissed the indictment *without* prejudice. Opening Br. 64–66. That argument is waived.

Mr. Parias's motion expressly requested dismissal with prejudice. ER-122–23. The government undoubtedly knew it could argue that any dismissal should be without prejudice—disputes over whether dismissal of the indictment should be with, or without, prejudice are common in criminal cases. *See Bundy*, 968 F.3d at 1031. But the government instead made a strategic decision to offer only other remedies—mainly, a continuance—without arguing in the alternative for dismissal without prejudice. *See* ER-135, ER-143–44. That is textbook waiver. *See United States v. Olano*, 507 U.S. 725, 733 (1993).

The government cannot complain that the district court did not dismiss without prejudice when it offered the court no basis for doing so. Its argument should be rejected for that reason alone. *See United States v. Cruz*, 554 F.3d 840, 848 (9th Cir. 2009) ("We apply [the waiver]

rule with some vigor against criminal defendants; we should be no less vigorous in applying it against the government.").

#### *ii. At the Very Least, the District Court Did Not Plainly Err by Dismissing with Prejudice*

But even if not waived, the government's argument that the district court should have dismissed without prejudice is reviewable, at most, for plain error. *See Engstrom*, 166 F.4th at 841–42. And there, the government has committed a separate waiver: by failing to address plain error in its opening brief, the government has not shown that demanding standard is met. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) ("Generally, an issue is waived when the appellant does not specifically and distinctly argue the issue in [the] opening brief.").

Nor could the government make that showing if it tried. Plain error requires (1) that the district court erred, (2) that the error was "clear or obvious, rather than being subject to reasonable dispute," (3) that the error affected the government's substantial rights, and (4) that the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Engstrom*, 166 F.4th at 842.

Establishing plain error is always "difficult," *Puckett v. United States*, 556 U.S. 129, 135 (2009), but particularly when a discretionary decision is at issue. Plain error-review is "even more deferential than review for abuse of discretion," *United States v. Rizk*, 660 F.3d 1125, 1132 (9th Cir. 2011). Under this "doubly deferential" standard, the government can prevail only by demonstrating that the district court committed an *obvious* abuse of discretion. *United States v. Willoughby*, 742 F.3d 229, 238 (6th Cir. 2014). The government has not done so.

#### *a. The District Court's Decision Aligned with* **Santos-Flores** *and Decisions of Other Judges in the District*

"[A]n error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Anekwu*, 695 F.3d 967, 973 (9th Cir. 2012).

The closest precedent is *Santos-Flores*, which held that district courts have authority to "craft an appropriate remedy" when the government's decision to place the defendant in immigration detention "jeopardizes the district court's ability to try him." 794 F.3d at 1092. *Santos-Flores* supported that statement with a citation to the specific

portion of a district court decision that had expressly contemplated dismissing an indictment with prejudice. *Id.* (citing *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1179–81 (D. Or. 2012)).[18] Thus, *Santos-Flores* at least suggested—if not outright held—that dismissal with prejudice could be warranted if constitutional violations in immigration detention prevent a criminal case from proceeding to trial. *Id.*

No controlling authority holds otherwise. It was not an abuse of discretion—much less plain error—for the district court to have done exactly what this Court's precedent envisioned. *See id.* And the appropriateness of the district court's remedy is bolstered by the fact that other judges of the district also dismissed indictments with prejudice after being confronted with nearly identical Sixth Amendment violations at Adelanto. *See Cajbon-Gomez*, 2026 WL 1084837, at *2–5; *Basmadjian*, No. 2:23-cr-652-HDV, ECF 84 at 15–16. The district court did not plainly err by reaching the same conclusion as its peers. *Cf. United States v. Gomez*, 165 F.4th 1199, 1211–12 (9th Cir. 2026) (en

---

[18] *See Trujillo-Alvarez*, 900 F. Supp. 2d at 1181 (providing that if the defendant were not released from immigration detention, "the criminal charge . . . will be dismissed with prejudice").

banc) (no plain error when non-precedential decisions had reached the same conclusion as the district court).

In an effort to muster countervailing authority, the government points to the Supreme Court's decision in *Morrison*. *See* 449 U.S. 361. But that case involved a one-off constitutional violation that caused no prejudice. *Id.* at 362–63. The Court held only that a district court may not dismiss an indictment when there is no "demonstrable prejudice, or substantial threat thereof." *Id.* at 365.

Here, by contrast, the prejudice was clear. The Sixth Amendment violations had prevented the trial from proceeding—something the district court correctly found had prejudiced Mr. Parias. *See* ER-30. And the violations were still *ongoing*, with no sign of abating, leaving the defense unable to review discovery with Mr. Parias, file motions on his behalf, or otherwise investigate and prepare for trial. ER-192–94. The violations obviously had an "adverse impact upon the criminal proceedings." *Morrison*, 449 U.S. at 367; *see United States v. Kimmel*, 741 F.2d 1123, 1126 (9th Cir. 1984) (*Morrison* does not apply when the defendant establishes "specific instances of prejudice to his defense").

The district court did not clearly err in finding concrete harms that warranted dismissal with prejudice.

#### ***b. The District Court Reasonably Found That Dismissal Without Prejudice Would Give the Government an Unfair Opportunity to Salvage Its Faltering Case***

The government takes issue with the district court's factual finding that allowing the government to start over would give it an unfair chance to "salvage what appears to be a poorly conducted prosecution." ER-31 (cleaned up); *see* Opening Br. 65–66. But there is no question that this was a valid consideration. *Bundy* and *Chapman* affirmed district court orders that rested on exactly this reasoning. *Bundy*, 968 F.3d at 1044 ("Lesser sanctions—such as a continuance to allow the defendants to review discovery or declaring a mistrial and starting over—would have given the government an opportunity to strengthen its case at the defendants' expense."); *Chapman*, 524 F.3d at 1087 ("The district court . . . properly rejected that argument, because the mistrial remedy would advantage the government, probably

allowing it to salvage what the district court viewed as a poorly conducted prosecution.”).

The district court’s finding that Mr. Parias would suffer the same prejudice was amply supported by the record. District courts are “in the best position . . . to gauge the prejudicial effects” of allowing a re-prosecution, *Chapman*, 524 F.3d at 1087, and the district court here had a front-row seat to the government’s repeated failures. Among other things, the district court had witnessed the government (1) assign the case to a single prosecutor who would be gone for 10 days during the month before trial, including in the period encompassing critical pretrial deadlines, ER-14; (2) “inexplicably” produce no discovery until more than a month into the case, ER-13; (3) violate the court’s deadlines with impunity, ER-13–14; and (4) claim to be powerless to do anything to provide Mr. Parias access to his attorneys at Adelanto—a constitutional right the government had the obligation to protect, ER-61–63.

Calling this a “poorly conducted prosecution” would be charitable. *See Chapman*, 524 F.3d at 1087. And the district court reasonably found that permitting a do-over—“with timely production of discovery,

compliance with the court's deadlines, and adherence to its disclosure obligations"—would prejudice Mr. Parias by allowing the government to salvage what appeared to be a faltering case. ER-31. Nothing in the court's reasoning was an abuse of discretion, much less an obvious one.[19] *Bundy*, 968 F.3d at 1044; *Chapman*, 524 F.3d at 1087.

#### c. *The Government's* **Ad Hominem** *Attacks on the District Judge Are Meritless*

Finally, the government launches a direct attack on the district court itself. It argues that regardless of what the court wrote, its "true aim" was to "protest[] ICE's practices," with its 28 pages of reasoning only a "fig leaf" concealing a secret goal of "rebuk[ing] the Executive Branch." Opening Br. 3, 37, 66. But "*ad hominem* attacks are not a substitute for effective advocacy," and many of the government's

---

[19] Nor was there any error in deciding the motion without holding another hearing. *But see* Opening Br. 65. The district court wrote that it had considered the arguments made at the December 9 hearing, ER-5, and the government never requested an additional hearing—not even when the district court explicitly informed the parties that it might not hold one, ER-69. *United States v. Plascencia-Orozco*, 852 F.3d 910, 923 (9th Cir. 2017) (failure to hold a hearing *sua sponte* "was . . . not error, let alone plain error."). Moreover, the assigned prosecutor did not attend the two hearings the court *did* hold, instead sending replacements with "little knowledge of the case." ER-14. The district court had ample reason for believing that further hearings would be fruitless. ER-14.

accusations are simply false. *Washington v. Trump*, 858 F.3d 1168, 1185 (9th Cir. 2017) (Bybee, J., dissenting from denial of reconsideration). For instance, the government complains that the district court dismissed the indictment "at the outset of the case." Opening Br. 25. But the court did not issue its dismissal order until three days before the December 30 trial—the *end* of the case—and only after giving the government more than a month to cure its ongoing violations of Mr. Parias's Sixth Amendment rights. *See* ER-32.

The government's rhetoric is unfair to the experienced district judge, who was forced to step in to protect Mr. Parias's constitutional rights when the government made clear it would not do so. Indeed, speculating about the district court's motives is particularly misplaced here, where the government *has not disputed* that it violated Mr. Parias's Sixth Amendment rights. The government cannot complain that the district court "rebuk[ed] the Executive Branch" in a case in which its own concessions make clear that a rebuke was warranted.

The district court was not some rogue actor, and its decision was no outlier. Other judges in the Central District of California reached the same conclusion that dismissal with prejudice was necessary to remedy

nearly identical Sixth Amendment violations at Adelanto—decisions the government did not appeal. *Cajbon-Gomez*, 2026 WL 1084837, at *2–5; *Basmadjian*, No. 2:23-cr-652-HDV, ECF 84 at 15–16.[20] Nor did the district court rush to judgment. Although understandably concerned about Mr. Parias's ability to access counsel in Adelanto, the court made clear that it would make no decision until after considering the parties' briefing. ER-67. Indeed, it went so far as to tell them to assume that the case was going to trial. ER-67.

In the end, the government points the finger at everyone but itself. That this case could not proceed was entirely due to its own failure to respect Mr. Parias's Sixth Amendment rights. But rather than accepting responsibility for these violations, its brief repeatedly "minimize[s] the extent of [its] misconduct" and "disregard[s] [its] repeated misrepresentations to the [district] court." *Bundy*, 968 F.3d at 1044–45. This "lack of contrition on appeal" only underscores why dismissal with prejudice was neither an abuse of discretion nor plainly

---

[20] After initially filing a notice of appeal in *Basmadjian*, the government voluntarily dismissed the appeal before any briefing was filed. *United States v. Basmadjian*, No. 26-1067, Dkt. 9 (9th Cir.).

erroneous.[21] *Chapman*, 524 F.3d at 1088 ("The government's tactics on appeal only reinforce our conclusion that it still has failed to grasp the severity of the prosecutorial misconduct involved here, as well as the importance of its constitutionally imposed . . . obligations.").

## II. The District Court Dismissed the Indictment Expressly—and Only—to Remedy Sixth Amendment Violations

The government devotes most of its brief to arguing that there is no conflict between the Bail Reform Act and Immigration and Nationality Act. But that issue is simply not presented here. The district court dismissed the indictment expressly—and *only*—to remedy the now-undisputed Sixth Amendment violations. The Court should reject the government's request for an advisory opinion on a question of statutory interpretation the district court did not resolve.

[21] Beyond the fact that the government has not established an abuse of discretion, much less a plain one, the government also cannot satisfy the other prongs of plain error. The district court's order became necessary only because *the government* had violated Mr. Parias's Sixth Amendment rights. When the government is the party that "seriously affected" the fairness of the proceedings below, it is in no position to complain about the district court's choice of remedy. *See Rosales-Mireles v. United States*, 585 U.S. 129, 142 (2018) ("[C]ountervailing factors [may] satisfy the court of appeals that the fairness, integrity, and public reputation of proceedings will be preserved absent correction.").

### A. The District Court's Decision Did Not Rest on a Violation of the Bail Reform Act

#### 1. The Court Repeated Several Times That It Was Not Issuing a Statutory Holding

The district court made clear that its decision to dismiss the indictment rested only on Sixth Amendment grounds. The court expressly wrote as much: "[T]he court's findings and conclusions concerning the Sixth Amendment violation are sufficient to independently resolve defendant's Application . . . ." ER-19. And throughout its order, it took care to emphasize that it was not issuing any statutory holding.

Take the district court's discussion of the government's out-of-circuit cases addressing the interaction between the BRA and INA. ER-26. The court did not disagree with those cases,[22] it simply recognized that they were irrelevant to the constitutional issue here. As the court explained, the government's cases addressed only the *statutory* question of whether the BRA "preclude[d] the government from exercising its independent detention authority under the INA." ER-26. But they said nothing about the dispositive issue in this case: "a district court's

[22] *But see* Opening Br. 37 (wrongly accusing the court of "dismiss[ing] this wall of authority")

authority to craft appropriate remedies for *constitutional* violations occasioned by the administrative detention of a criminal defendant." ER-26 (emphasis added).

The district court then repeated the same point: Any suggestion that the statutory cases required denial of the motion "would misunderstand the defense's argument *and this court's reasoning*." ER-26 (emphasis added and cleaned up). Once more, it made the basis of its holding clear: "[T]he matter at issue here is whether Mr. Parias's remote immigration detention, whether legally justified or not"—that is, whether *compliant with the BRA and INA or not*—"is functionally depriving him of access to counsel and interfering with his right to prepare his defense for trial." ER-26. And if that were not enough, the court then said the same thing again:

> [T]he government has jeopardized this court's ability to try Mr. Parias in compliance with the demands *of the Sixth Amendment* by placing him in immigration detention. *No further finding or ruling is needed*.

ER-26 (emphasis added).

The district court's statements cannot be read as anything but an explicit disclaimer of any suggestion that it had decided the motion on statutory grounds. And the court's remedies analysis confirms as

much—it focused only on what would be sufficient to cure the Sixth Amendment access-to-counsel violations. ER-29–32. Had the court instead held that its release order under the Bail Reform Act eliminated any authority to detain Mr. Parias under the INA, the remedy presumably would have been to order his release from unlawful detention. But the court did not even consider that option, a clear indication that it found no violation of the BRA. *See* ER-29–32.

The government has waived any response to the district court's statements by failing to address them. *Kama*, 394 F.3d at 1238. And they directly refute the government's claim that the court's decision rested on anything but Sixth Amendment grounds.

### 2. The Court's Discussion of the BRA and INA Merely Illustrated That Constitutional Violations Can Occur When ICE and DOJ Fail to Coordinate Their Actions

The government instead focuses on the court's discussion of "the arguments raised by the parties" regarding the BRA and INA. *See* ER-19. But even that discussion centered around constitutional issues. The court explained that the government's "failure to coordinate the overlapping actions of its separate agencies," as the BRA and INA contemplated, had "created a situation from which constitutional

violations could—and did—occur." ER-25. It observed that the decision to detain Mr. Parias in Adelanto was "when and where the constitutional violations began." ER-25. And it said what is obviously true: "When ICE detains a criminal defendant granted bail under the BRA . . . [it] must, at minimum, ensure that [the] defendant is able to exercise all of his or her constitutional rights." ER-28–29.

The court also made some more general observations about the interaction between the BRA and INA. Much of that discussion simply quoted from this Court's decision in *Santos-Flores*. ER-20–21; *see Santos-Flores*, 794 F.3d at 1091 ("The government may . . . exercise its judgment that the public interest in criminally prosecuting an alien is greater than the public interest in swiftly removing him."). And the court also repeated several times that the statutory framework "envisions government cooperation" between ICE and the Department of Justice. ER-21–22. But it never held that such cooperation was statutorily *required*—a point the government is eventually forced to concede. Opening Br. 30 n.11 (acknowledging that the district court found no BRA violation). Instead, the court explained that the failure of ICE and DOJ to cooperate "can jeopardize a criminal defendant's

constitutional rights"—exactly what happened here. ER-20. That is a constitutional holding, not a statutory one.

The government also attacks the district court's finding that Mr. Parias had been placed in Adelanto for the improper purpose of securing his appearance in the criminal case. Opening Br. 52–55; ER-27. There was nothing wrong with the court considering that issue. Even courts that have held that it is not categorically unlawful to detain a criminal defendant under the INA have recognized that a particular defendant may be able to show that his own immigration detention is "pretextual." *See United States v. Ventura*, 96 F.4th 496, 501–02 (2d Cir. 2024); *id.* at 504 (Lohier, J., concurring). And the Second Circuit has held that denying a defendant his criminal rights while in ICE custody is among "the clearest examples of pretextual immigration detention." *Id.* at 501–02. Particularly in light of the now-undisputed constitutional violations at Adelanto, the district court's finding of pretext was not clearly erroneous.[23] *See id.*

---

[23] As the district court noted, there was other evidence of pretext. Among other things, government claimed to be powerless to ensure constitutionally adequate access to counsel at Adelanto, ER-61–63, even (Continued . . .)

But regardless, even if there were error in the pretext finding, it would not merit reversal. This Court "revie[ws] judgments, not statements in opinions." *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.3 (2026). As the government concedes, the district court did not ultimately find any BRA violation. Opening Br. 30 n.11. The district court's belief that the government had attempted to circumvent that statute was, at most, dicta irrelevant to its separate Sixth Amendment holding.[24]

### 3. There is No Basis for Attempting to Look Behind the District Court's Written Order

With no answer for the district court's Sixth Amendment holding, the government plucks statements from earlier hearings to claim that the Sixth Amendment analysis was merely a "hook" to further some extralegal "fixation" on "protesting ICE." Opening Br. 37–38, 66. But the government cites no authority for its invitation to second-guess the district court's motives. It would be particularly strange to do so here,

---

though it was evidently able to coordinate with Adelanto in other ways, including to arrange Mr. Parias's transportation to court. ER-25, ER-27.

[24] The same is true of the district court's discussion of § 3142(d) of the BRA. That discussion was tangential to the district court's bottom-line decision, which rested only on Sixth Amendment grounds.

since the government does not dispute that the court's Sixth Amendment analysis was correct. Nor does the government explain how the court's subjective motives could even be relevant when it is now undisputed that the government violated Mr. Parias's Sixth Amendment rights. The Court should instead presume that the district court "meant what it said." *Celotex Corp. v. Catrett*, 477 U.S. 317, 320 n.2 (1986); *see United States v. Green*, 152 F.4th 1025, 1034 (9th Cir. 2025) ("We . . . presume that trial judges 'know the law' and 'apply it in making their decisions.'").

But if even the district court's earlier statements were considered, they merely reflect justifiable concern that Mr. Parias's transfer to Adelanto would jeopardize the pending criminal case. *See, e.g.*, ER-61 ("I'm a little concerned . . . . One of the things they raised last week . . . is their ability to meet with their clients to prepare for trial. And it's coming up soon. So . . . what is the government's position at this point? . . . [I]s he going to be released from ICE custody[?]"). It was well known in the district that it is extraordinarily challenging for attorneys to access their clients in Adelanto. That is why the defense immediately

raised the issue with the district court upon learning of Mr. Parias's transfer. *See* SER-47–48.

Nor was there anything wrong with the district court questioning the government's meritless appeal of the magistrate judge's release order or asking why Mr. Parias had been transferred to ICE custody when the government had previously taken the position that such a transfer would be unlawful. *See* ER-38–40, ER-51–52. Judges are entitled to ask tough questions, and the government raised no issue with the questioning at the time, even when expressly invited to do so. *See* ER-41, ER-52. There was no error—much less plain error—in the district court's statements. *Engstrom*, 166 F.4th at 842 (review is only for plain error when the government failed to object below).

It is only on appeal that the government has tried to spin the court's statements into a claim that the judge had "made up his mind well before the parties ever stepped foot into his courtroom." Opening Br. 56. That assertion is contrary to both the presumption of regularity owed to the district court and the court's own assurances that it would reach a decision only after the adversarial process was complete. *See* ER-67 ("I don't know how it's all going to shake out until I read the

briefing."); *Miller v. United States*, 78 U.S. 268, 299 (1870) ("[I]n courts of record all things are presumed to have been rightly done."). The Court should reject it.

### B. The Court Should Not Issue an Advisory Opinion on a Statutory Question the District Court Did Not Resolve

The government's brief makes clear that its true goal is to procure a sweeping advisory opinion on an issue the district court never resolved: whether it is categorically unlawful to place a criminal defendant in immigration detention after he has been ordered released under the Bail Reform Act. It devotes an entire section of its brief to attacking *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167 (D. Ore. 2012), a 14-year-old district court decision the government did not appeal at the time. Opening Br. 48–52. And while conceding that the district court found no BRA violation in *this* case, Opening Br. 30 n.11, the government complains that the court found such a violation in a *different* case: *United States v. Arreola-Arreola*. Opening Br. 31 n.12.

These arguments must await a case in which they are properly presented. "Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v.*

*Chafin*, 568 U.S. 165, 172 (2013) (cleaned up). The district court made clear that its Sixth Amendment access-to-counsel holding—which had nothing to do with the government's statutory arguments—"independently" required dismissal. ER-19. There is nothing this Court could say about the BRA and INA that would affect the rights of *Mr. Parias*—he remains entitled to dismissal on constitutional grounds. *Chafin*, 568 U.S. at 172.

As this Court explained in a similar context, the government cannot obtain an advisory opinion that there is "*some* set of circumstances under which the statute[s] would be valid," when the only question in this case is whether "*these* circumstances amount to an as-applied [constitutional] violation." *Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021) (cleaned up). The same is true here.

And justiciability problems aside, the government has already squandered numerous opportunities to seek this Court's review of the interaction between the BRA and INA. Although the government now paints the district court decision in *Trujillo-Alvarez* as grievously wrong, it admits that it chose not to appeal that decision. Opening Br. 21. And even after filing its opening brief in this case, the government

voluntarily dismissed its appeal in another case, *Arreola-Arreola*, that *actually* rested on BRA/INA grounds. *United States v. Arreola-Arreola*, No. 25-5471, Dkt. 17.[25] That follows the government's concession that it also recently dismissed two *other* appeals that, it says, turned on the BRA/INA issue. *See* Opening Br. Statement of Related Cases (conceding that the government voluntarily dismissed appeals in *United States v. Solano-Lopez*, No. 25-5469, and *United States v. Amezola-Arenas*, No. 25-6201)

If the government wants review of this question, it should see the appeal through to decision in a case in which it is actually presented. But this is not that case. The Court should reject the government's request for an advisory opinion that would make no difference to the outcome here. *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]if it is not necessary to decide more, it is necessary not to decide more.").

---

[25] The government notes that the defendant in *Arreola-Arreola* failed to file an answering brief after the government removed him from the country. Opening Br. 31 n.12. But this Court explained that if no brief were filed, it would decide the appeal on the opening brief alone. *United States v. Arreola-Arreola*, No. 25-5471, Dkt. 14. Instead of seeing the case through to decision, the government voluntarily dismissed it. *Id.* Dkt. 17.

### C. Any Error in the District Court's Statutory Discussion Was Harmless

For similar reasons, any error in the district court's statutory discussion was harmless. The Court can affirm on "any ground supported by the record." *United States v. Mongol Nation*, 56 F.4th 1244, 1253 n.6 (9th Cir. 2023). Accordingly, "[w]hen a district court lists several reasons for taking a certain action, and one of the reasons is flawed, the district court's decision should still be upheld if other reasons support the ruling." *United States v. Stauffer*, 922 F.2d 508, 516 (9th Cir. 1990).

*Bundy* is instructive. There, the Court affirmed the district court's decision to dismiss an indictment with prejudice even while concluding the court had erred in some of its factual findings. *See Bundy*, 968 F.3d at 1041–42. Similarly, when a case involves both statutory and constitutional issues, the Court can affirm on one ground without reaching the others. *Mongol Nation*, 56 F.4th at 1253 (affirming "without reaching the district court's constitutional rationales").

Even if the district court's order could be read to reflect misconceptions about the BRA and INA, and even if it could somehow be treated as resting in part on that basis, the court made clear that the

constitutional access-to-counsel violations separately required dismissal. ER-19. If the case is returned to the district court, the court will simply do what its order says it already did: dismiss the indictment with prejudice based on Sixth Amendment violations that were "sufficient to independently" resolve Mr. Parias's motion. ER-19. Remand would therefore be pointless. *Agarwal v. Arthur G. McKee & Co.*, 644 F.2d 803, 807 n.3 (9th Cir. 1981) (remand would be futile when "the district court would reach the same result").

Because the district court's Sixth Amendment holding independently supports its judgment—indeed, was the only basis for the judgment—this Court should affirm. *Mongol Nation*, 56 F.4th at 1253.

## **CONCLUSION**

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

AMY KARLIN
Interim Federal Public Defender

Dated: August 31, 2026

By: */s/ Alexander Botoman*
ALEXANDER BOTOMAN
Deputy Federal Public Defender
Attorneys for Defendant-Appellee

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8156

I am the attorney or self-represented party.

**This brief contains** 13,967 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Alexander Botoman **Date** 08/31/26
*(use "s/[typed name]" to sign electronically-filed documents)*